Filed with the Classified
Information Security Officer
CISO _M.Rovers_
Date _2/12/2016_

No. 15-4297

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Appellee,*

v.

JEFFREY ALEXANDER STERLING,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Virginia
No. 1:10-cr-00485-LMB-1

# BRIEF OF DEFENDANT-APPELLANT
# JEFFREY ALEXANDER STERLING

Lawrence S. Robbins
William J. Trunk
ROBBINS, RUSSELL, ENGLERT, ORSECK,
 UNTEREINER & SAUBER LLP
1801 K Street, N.W., Suite 411
Washington, D.C. 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
wtrunk@robbinsrussell.com

*Counsel for Defendant-Appellant Jeffrey Alexander Sterling*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ............................................................1

STATEMENT OF JURISDICTION.......................................................3

STATEMENT OF THE ISSUES...........................................................3

STATEMENT OF THE CASE...............................................................4

      A. The Program ..........................................................................4

      B. Risen Discusses The Program In *State Of War*...........................5

      C. The Case Against Sterling ........................................................6

      D. The Indictment.....................................................................10

      E. The Government Pursues Risen's Testimony To Establish Venue,
         Then Reverses Course ............................................................11

      F. The Trial .............................................................................13

      G. Sterling Is Convicted ............................................................15

SUMMARY OF ARGUMENT ............................................................16

ARGUMENT ....................................................................................19

I.    THE NON-OBSTRUCTION CONVICTIONS SHOULD BE
      REVERSED BECAUSE THE GOVERNMENT FAILED TO
      PROVE VENUE IN THE EASTERN DISTRICT OF VIRGINIA..............19

II.   THE NON-OBSTRUCTION COUNTS SHOULD, AT A
      MINIMUM, BE REMANDED BECAUSE THE DISTRICT COURT
      GAVE THE JURY AN ERRONEOUS VENUE INSTRUCTION..............31

      A. The District Court Erroneously Instructed The Jury That It Could
         Find Venue If Mere "Preparatory Acts" Occurred In The District.........31

B. The Error Was Not Harmless ..................................................................38

III. THE OBSTRUCTION CONVICTION SHOULD BE REVERSED BECAUSE THERE IS NO EVIDENCE THAT STERLING INTENTIONALLY OBSTRUCTED THE GRAND JURY PROCEEDING ..............................................................................39

IV. ALTERNATIVELY, THE CASE SHOULD BE REMANDED FOR A NEW TRIAL BECAUSE THE DISTRICT COURT ERRONEOUSLY ADMITTED PREJUDICIAL CHARACTER EVIDENCE ..................................................................47

A. The District Court Erroneously Allowed The Government To Offer Character Evidence Establishing Sterling's Propensity To Mishandle Classified Material.................................................................47

B. The Error Was Devastating ......................................................54

CONCLUSION..............................................................................57

REQUEST FOR ORAL ARGUMENT ..................................................57

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

STATUTORY ADDENDUM

# TABLE OF AUTHORITIES

**Cases**

*Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005).................................41

*Goldsmith v. Witkowski*, 981 F.2d 697 (4th Cir. 1992) ...........................................44

*Reass v. United States*, 99 F.2d 752 (4th Cir. 1938)...............................................33

*United States v. Aguilar*, 515 U.S. 593 (1995) ............................................... 44, 45

*United States v. Battle*, 774 F.3d 504 (8th Cir. 2014) ...........................................52

*United States v. Beech-Nut Nutrition Corp.*,
   871 F.2d 1181 (2d Cir. 1989) ..................................................... 22, 34

*United States v. Bowens*, 224 F.3d 302 (4th Cir. 2000)............................. 21, 30, 33

*United States v. Bull*, 145 F.3d 1326 (4th Cir. May 20, 1998)...............................45

*United States v. Cabrales*, 524 U.S. 1 (1998)........................................................20

*United States v. Candella*, 487 F.2d 1223 (2d Cir. 1973) ......................................37

*United States v. Caudle*, 758 F.2d 994 (4th Cir. 1985) ..........................................35

*United States v. Day*, 700 F.3d 713 (4th Cir. 2012) ..............................................35

*United States v. Ebersole*, 411 F.3d 517 (4th Cir. 2005)..................... 20, 31, 36, 37

*United States v. Evans*, 318 F.3d 1011 (10th Cir. 2003) ........................................27

*United States v. Foutz*, 540 F.2d 733 (4th Cir. 1976)............................................52

*United States v. Foy*, 641 F.3d 455 (10th Cir. 2011)..............................................30

*United States v. Friske*, 640 F.3d 1288 (11th Cir. 2011)........................... 41, 43, 44

*United States v. Georgacarakos*, 988 F.2d 1289 (1st Cir. 1993) .................... 37, 38

*United States v. Greene*, 995 F.2d 793 (8th Cir. 1993) ..........................................27

*United States v. Hernandez*, 189 F.3d 785 (9th Cir. 1999) ....................................30

*United States v. Hernandez*, 975 F.2d 1035 (4th Cir. 1992) ..................................57

*United States v. Howard*, 773 F.3d 519 (4th Cir. 2014)..........................................40

*United States v. Jefferson*, 674 F.3d 332 (4th Cir. 2012) ................................. 20, 33

*United States v. Johnson*, 323 U.S. 273 (1944) ................................................. 20, 30

*United States v. Johnson*, 617 F.3d 286 (4th Cir. 2010)............................. 50, 56, 57

*United States v. Madden*, 38 F.3d 747 (4th Cir. 1994)............................... 55, 56, 57

*United States v. Matthews*, 505 F.3d 698 (7th Cir. 2007) .......................................41

*United States v. McBride*, 676 F.3d 385 (4th Cir. 2012) ..................... 49, 52, 54, 57

*United States v. McKibbins*, 656 F.3d 707 (7th Cir. 2011) ....................................45

*United States v. Miller*, 111 F.3d 747 (10th Cir. 1997)..........................................39

*United States v. Miller*, 673 F.3d 688 (7th Cir. 2012) ............................................53

*United States v. Moore*, 709 F.3d 287 (4th Cir. 2013) ...........................................53

*United States v. Parral-Dominguez*, 794 F.3d 440 (4th Cir. 2015)........................47

*United States v. Passodelis*, 615 F.2d 975 (3d Cir. 1980) ......................................27

*United States v. Perlitz*, 728 F. Supp. 2d 46 (D. Conn. 2010)......................... 22, 34

*United States v. Petruk*, 781 F.3d 438 (8th Cir. 2015) ..................................... 41, 43

*United States v. Phillips*, 583 F.3d 1261 (10th Cir. 2009)......................................41

*United States v. Quattrone*, 441 F.3d 153 (2d Cir. 2006).......................................45

*United States v. Queen*, 132 F.3d 991 (4th Cir. 1997).............................................49

**TABLE OF AUTHORITIES—Continued**

Page(s)

*United States v. Ramirez*, 420 F.3d 134 (2d Cir. 2005) ............................. 21, 25, 33

*United States v. Reich*, 479 F.3d 179 (2d Cir. 2007) ................................. 41

*United States v. Rodriguez-Moreno*, 526 U.S. 275 (1999) ............................... 20, 33

*United States v. Rooney*, 37 F.3d 847 (2d Cir. 1994) ................................. 57

*United States v. Ryan*, 455 F.2d 728 (9th Cir. 1971) .................................. 43

*United States v. Siegel*, 536 F.3d 306 (4th Cir. 2008) ............................... 49

*United States v. Simpson*, 741 F.3d 539 (5th Cir. 2014) ......................... 41

*United States v. Smith*, 452 F.3d 323 (4th Cir. 2006) ................................ 21, 35, 36

*United States v. Stacy*, 769 F.3d 969 (7th Cir. 2014) ............................... 54

*United States v. Sterling*, 724 F.3d 482 (4th Cir. 2013) ......................... 12

*United States v. Stewart*, 256 F.3d 231 (4th Cir. 2001) .................................. 34, 35

*United States v. Strain*, 396 F.3d 689 (5th Cir. 2005) ......................... 21, 25, 33, 34

*United States v. Sun Myung Moon*, 718 F.2d 1210 (2d Cir. 1983) ......................... 43

*United States v. Tingle*, 183 F.3d 719 (7th Cir. 1999) ............................... 21

*United States v. Tzolov*, 642 F.3d 314 (2d Cir. 2011) ...................................... 34, 35

*United States v. Umana*, 750 F.3d 320 (4th Cir. 2014) .................................... 21, 24

*United States v. Varner*, 748 F.2d 925 (4th Cir. 1987) ............................ 37

*United States v. Walker*, 677 F.2d 1014 (4th Cir. 1982) ......................... 37

*United States v. Zettl*, 835 F.2d 1059 (4th Cir. 1987) ............................... 55

# TABLE OF AUTHORITIES—Continued

Page(s)

**Statutes**

18 U.S.C. § 641 .................................................................3, 11

18 U.S.C. § 793 ............................................................... 10, 29

18 U.S.C. § 793(d) ......................................................... 3, 10, 11

18 U.S.C. § 793(e) ......................................................... 3, 10, 11

18 U.S.C. § 793(g) ...............................................................29

18 U.S.C. § 1071 ................................................................33

18 U.S.C. § 1341 ................................................................11

18 U.S.C. § 1512(c) ....................................................... 3, 39, 40

18 U.S.C. § 1512(c)(1) ...................................................... 11, 40

18 U.S.C. § 1512(f) ..............................................................41

18 U.S.C. § 1512(i) ..............................................................14

18 U.S.C. § 1515 ................................................................40

18 U.S.C. § 3231 .................................................................3

28 U.S.C. § 1291 .................................................................3

**Rules**

Fed. R. Evid. 404(b) ........................................................ *passim*

Fed. R. Evid. 404(b)(2) ...........................................................49

**TABLE OF AUTHORITIES—Continued**

Page(s)

**Other Authorities**

THE DECLARATION OF INDEPENDENCE (U.S. 1776) .................................................20

Charlie Savage, *Holder Hints Reporter May Be Spared Jail in Leak*, N.Y. TIMES, May 27, 2014, at A13 ...............................................................................12

# PRELIMINARY STATEMENT

Jeffrey Sterling was a CIA operations officer. From 1998 to 2000, he was the case officer on a classified program designed to stymie Iran's nuclear program. Under that program, the CIA provided (through covert means) a flawed set of nuclear blueprints to Iran, hoping they would cause Iran to waste time and money developing a uranium-enriched paperweight.

In 2006, James Risen, a *New York Times* reporter, published a book in which he discussed (in somewhat critical fashion) that classified program. Although Risen did not disclose his sources, the government launched an investigation and ultimately built a circumstantial case against Sterling, based principally on phone and email records. The government charged Sterling with, among other things, the unlawful retention and transmission of national-defense information, as well as obstruction of justice. Sterling was tried in the Eastern District of Virginia, convicted, and sentenced to forty-two months' imprisonment.

Sterling's conviction should be reversed. For starters, venue was improper for all of the non-obstruction counts. The government never proved that Sterling possessed, disclosed, transmitted, communicated, or did *anything* unlawful with national-defense information in the Eastern District of Virginia. The government found evidence that Sterling and Risen spoke by telephone for only four minutes (spanning seven phone calls) in the years that Sterling was living in Virginia. Its

theory, by necessity, was that Sterling and Risen met in person to discuss the program. But the government offered no evidence that such a meeting occurred, much less where. Because mere telephone calls—even ones planning or arranging for commission of a crime—are insufficient to sustain venue, Sterling had no business being tried in the Eastern District of Virginia.

Making matters worse, the district court gave the jury an erroneous venue instruction. Rather than instructing the jury that it must find that *essential criminal conduct* occurred in the Eastern District of Virginia (as the law commands), the court instead instructed the jury that it could find venue so long as an "*act in furtherance*" of the crime occurred in the district. That is not the law. With this erroneous instruction, moments-long telephone calls suddenly loomed much larger—even if Sterling did not disclose classified information to Risen over the telephone, the jury could convict so long as those calls were "in furtherance of" Sterling's crime. That jury instruction is irreconcilable with decades of Fourth Circuit and Supreme Court case law, and itself warrants a new trial.

As for the obstruction charge, the government chose the correct venue for that count. But the government never proved obstruction. It charged that Sterling deleted an old email with the specific intent to obstruct the grand jury, yet failed to show that Sterling even *knew* about the grand jury's investigation when that email was deleted.

Last, the district court allowed the government to admit as "similar acts" evidence four classified documents that were seized from Sterling's residence in 2006. The documents were decades old and had nothing to do with the Iran program, nuclear weapons, Risen, or any of the charged offenses. The government's purpose for introducing them—as the government would admonish the jury in its closing statement—was simply to establish that Sterling is "a man who keeps CIA documents at his home." Admission of this evidence was legally erroneous, wildly prejudicial, and likewise warrants a new trial.

## STATEMENT OF JURISDICTION

This is an appeal from a final judgment of conviction against Jeffrey Alexander Sterling entered on May 11, 2015. JA2492-96. The district court had jurisdiction under 18 U.S.C. § 3231. Sterling filed a timely notice of appeal on May 26, 2015. JA2530-31. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Sterling was convicted of the unauthorized retention, disclosure, and attempted disclosure of information relating to the national defense, 18 U.S.C. §§ 793(d)–(e), causing the unlawful conveyance of government property, 18 U.S.C. § 641, and obstruction of justice, 18 U.S.C. § 1512(c). This appeal presents four issues:

I.     Whether Sterling's convictions on the non-obstruction counts (Counts I-VII and IX) should be reversed because the government failed to prove venue in the Eastern District of Virginia.

II.     Alternatively, whether the non-obstruction counts should be remanded for a new trial because the district court gave the jury an erroneous venue instruction.

III.     Whether Sterling's conviction for obstruction (Count X) should be reversed because the evidence was insufficient to support a finding that Sterling intended to obstruct an official proceeding.

IV.     Whether Sterling is entitled to a new trial because the district court admitted prejudicial character evidence, comprising four classified documents seized from Sterling's residence, unduly suggestive of Sterling's propensity to mishandle classified material.

## STATEMENT OF THE CASE

### A.     The Program

From May 1993 to January 2002, Sterling worked as an operations officer for the CIA.  JA37.  In November 1998, the CIA assigned Sterling to a classified program ("**Program**") designed to frustrate Iran's nuclear-weapons program. Under the Program, the CIA would create an ostensibly real (but secretly flawed) set of plans for building a nuclear-weapon component; the CIA would then provide

those plans to the Iranians, with the hope that they would waste years and resources developing a weapon that would never work. JA1050-51. Sterling was the Program's case officer from November 1998 to May 2000. In that role, he was the primary handler for the Russian scientist ("**Merlin**") whom the CIA recruited to deliver the plans to the Iranians. JA1127-28.

In May 2000, Sterling was reassigned and his involvement with the Program ended. JA1217-18. Sterling was subsequently terminated from the CIA in January 2002.

When Sterling left the CIA in 2002, he was living in Herndon, Virginia. JA1987-88. In August 2003, Sterling relocated to Missouri. *Ibid*. Sterling lived and worked in Missouri for the duration of the relevant time period. *Ibid*.; *see* JA1963-64, 2870-71.

## B. Risen Discusses The Program In *State Of War*

James Risen, a *New York Times* reporter, caught wind of the Program through one or more unnamed sources. On April 3, 2003, Risen informed the CIA and the National Security Council that he had information about the Program, and that he intended to publish a story about it in the *New York Times*. JA1258-59, 1399-1401, 1438-39, 2652. Risen commented that his story was based on "government documents and knowledgeable people." JA1414. Later that month, senior administration officials met with Risen and others from the *New York Times*

and persuaded them not to run the story, citing national-security concerns. JA1417-21, 1438-54.

Years later, Risen would disclose facts about the Program in his 2006 book, *State of War: The Secret History of the CIA and the Bush Administration*. In particular, Chapter 9 of the book—"A Rogue Operation"—describes, in broad strokes, the mechanics of the Program and recounts details from certain meetings and communications involving Merlin. *See* JA2613-39. In Chapter 9, Risen quotes from a cover letter ("**Cover Letter**") that Merlin evidently enclosed with the flawed design plans he delivered to the Iranians. JA2625-26.[1]

Risen did not disclose his sources for *State of War*. The book cites "many current and former officials from the Bush administration, the intelligence community, and other parts of the government" who spoke to Risen on conditions of anonymity. JA2532.

## C. The Case Against Sterling

After *State of War*'s publication, the government redoubled its effort to ferret out Risen's source.[2] Sterling became a focus of the investigation. Among other things, Sterling and Risen were known to have communicated previously; in

---

[1] Risen also quotes from Sterling's 2000 performance evaluation, which had been unclassified and produced in connection with Sterling's discrimination suit against the CIA. JA2618; *see* JA2643-46, 443-61, 524-32.

[2] The FBI had formally opened an investigation in April 2003 when Risen informed the CIA that he had information about the Program. *See* JA1954.

2002, Risen had written a *New York Times* article covering Sterling's race-discrimination action against the CIA. JA2650-51; *see* JA1411-12.

The government built a circumstantial case against Sterling based principally on phone and email records:

*Phone Records*. The government collected phone records revealing that Sterling and Risen were in periodic contact from 2003 to 2005. In those three years, Sterling and Risen exchanged forty-seven phone calls. *See* JA2801-14. The vast majority of those calls occurred after Sterling moved to Missouri. When Sterling was still living in Virginia (prior to August 2003), Sterling and Risen exchanged only seven phone calls for an aggregate duration of four minutes and eleven seconds. JA2801-02.[3] Three calls were fourteen seconds or shorter. Only two were longer than one minute. *Ibid*.

Given the fleeting nature of those calls, the government never argued that Sterling could have disclosed to Risen the details found in *State of War* over the telephone. Rather, the government's theory was that Sterling and Risen had met in person on one or more occasions, and that at one or more of those meetings Sterling disclosed national-defense information (and gave the Cover Letter) to Risen. *E.g.*, JA42, 324. At the time Sterling was living in Herndon, Risen resided

---

[3] After Sterling moved to Missouri, he and Risen spoke by telephone forty times for a total of more than two hours. JA2803-14.

in Gaithersburg, Maryland (30 miles from Herndon), and maintained an office in Washington, D.C. (24 miles).  *See* JA2801-14, 1846-47.

*Email Snapshots*.  In April 2006, the government sent a preservation request to Hotmail, Sterling's email provider.  JA1953-56.  In response, Hotmail took a "one time snapshot[]" of the contents of Sterling's email account as of April 19, 2006.  JA2849-50.  The government later renewed its preservation request, at which time Hotmail took a second "snapshot" of Sterling's email account as of July 14, 2006.  JA2853; *see* JA1957-58.

In October 2006, the government executed a search warrant requiring Hotmail to produce the contents of Sterling's email account.  JA1958-60, 2854-55. At that time, Hotmail produced to the government three sets of emails: (i) the emails in the April snapshot; (ii) the emails in the July snapshot; and (iii) the emails in the October collection.  JA1958-60.

*The CNN Email*.  Hotmail's production revealed that Sterling sent a single email to Risen while Sterling was living in Virginia.[4]  On March 10, 2003, Sterling forwarded to Risen a CNN article discussing Iran's nuclear program.  Sterling wrote:  "[Q]uite interesting, don't you think?  All the more reason to wonder …."

---

[4]  After Sterling moved to Missouri, he and Risen exchanged thirteen additional emails.  JA2803-14; *see* JA2870-71.  None of those emails was found to contain classified material or information about the Program.

JA2801, 2815-22.  The email did not discuss the Program, attach the Cover Letter, or otherwise disclose any classified information.

The government was able to recover the CNN Email only from the April snapshot.  It could not locate the email in either the July snapshot or the October collection.  JA1962-66.

*Subpoena*.  On June 16, 2006, Sterling was served with a subpoena at his Missouri home.  JA1963-64, 2851-52.  The subpoena was issued from the United States District Court for the Eastern District of Virginia and called for both testimony and documents.  JA2851-52.  In relevant part, it commanded Sterling to produce all classified documents in his possession, as well as any and all documents "concerning the [CIA] or the CIA's operations, sources, assets, or methods."  JA2852.

Sterling was not aware of the grand jury's proceeding before he received that subpoena.  *See* JA2102, 2231, 1965; *see also* JA62.  The subpoena did not request all communications between Sterling and Risen, nor did it call for all documents relating generally to Iran or its nuclear program.  JA2851-52.

*Documents Seized From Sterling's Home*.  On October 5, 2006, the FBI seized four CIA documents from Sterling's Missouri home.  *See* JA2730-31; *see*

*also* JA2724-25, *GX142-44.*[5]   The documents, marked "Secret," were personnel-type documents from Sterling's earliest days with the agency.   One of them, dated October 21, 1993, was Sterling's first performance appraisal from his time as a trainee.   JA2724-25; *see* JA1829-31.   The other three were from 1987 and listed telephone numbers that Sterling might need when away from the office.   *GX142-44*; *see* JA1829, 2264.   None of them had anything to do with the Program.   JA1831-32.

### D.   The Indictment

On December 22, 2010, the grand jury returned a 10-count indictment (JA35-65) charging Sterling with committing the following crimes within the Eastern District of Virginia:

➢   Retaining the Cover Letter without authorization (Count III), in violation of 18 U.S.C. § 793(e).   ("**Retention Count**").

➢   Disclosing to Risen national-defense information relating generally to the Program (Count IV), and specifically the Cover Letter (Count V), in violation of 18 U.S.C. §§ 793(d) and (e).[6]   ("**Risen Counts**").

---

[5] Italicized record cites denote classified materials that are not included in the Joint Appendix.   Those materials are on file with the CISO and available to Court personnel with the necessary clearances.

[6] Subsection (d) of 18 U.S.C. § 793 proscribes the willful communication, transmission, etc. of national-defense information over which the defendant had *lawful* access—here, facts about the Program that were in Sterling's head.

➢ Attempting to communicate national-defense information about the Program (Count VI) and the Cover Letter (Count VII) to the general public through Risen's never-published 2003 *New York Times* article, in violation of 18 U.S.C. §§ 793(d) and (e). ("**Attempt Counts**").

➢ Causing Risen to disclose national-defense information about the Program (Count I) and the Cover Letter (Count II), and causing Risen to convey government property (Count IX), to the general public through *State of War*'s publication, in violation of 18 U.S.C. §§ 641, 793(d)-(e). ("**Book Counts**").

➢ Obstructing justice by deleting the CNN Email with the intent to obstruct the grand jury proceeding (Count X), in violation of 18 U.S.C. § 1512(c)(1). ("**Obstruction Count**").[7]

### E. The Government Pursues Risen's Testimony To Establish Venue, Then Reverses Course

In order to prosecute Sterling in the Eastern District of Virginia, the government needed evidence that Sterling actually committed a crime in that district. The government subpoenaed Risen in the hope that he could testify that either he or Sterling was in the Eastern District of Virginia when the alleged

---

Subsection (e) forbids such conduct where the defendant had *unlawful* access to that information—namely, the Cover Letter.

[7] Sterling also was charged with mail fraud (Count VIII), 18 U.S.C. § 1341, for causing *State of War* to be delivered by mail to bookstores. The district court dismissed that count before the case went to the jury. *See* JA2101-08, 2181.

disclosures occurred. *See* JA66-99, 195-226. In its motion papers, the government explained why Risen's testimony was necessary: "While the Indictment alleges that Risen and Sterling exchanged phone calls and emails," the government explained, "very few of them occurred in 2003, when these disclosures occurred." JA209. With only a "handful" of telephone calls implicating the Eastern District of Virginia—the *longest* of which was 91 seconds—the government urged that "the jury should not have to rely on guesswork" to make a venue finding. *Ibid*.; *see* JA324 ("Simply put, there is no direct evidence, other than Risen's testimony, that establishes where the substantive disclosures of classified information occurred."); *see also* JA332.

The district court granted in part Risen's motion to quash the subpoena on reporter's-privilege grounds. JA279-310. This Court reversed, holding that Risen could be compelled to testify. *United States v. Sterling*, 724 F.3d 482, 491-510 (4th Cir. 2013). In the wake of that ruling, however, the government publicly intimated that Risen would not be punished if he refused to testify. *See* JA687-88, 660-63.[8] In a pre-trial *voir dire*, Risen declined to identify his sources for *State of*

---

[8] *See* Charlie Savage, *Holder Hints Reporter May Be Spared Jail in Leak*, N.Y. TIMES, May 27, 2014, at A13, available at http://www.nytimes.com/2014/05/28/us/holder-hints-reporter-may-be-spared-jail-in-leak.html?_r=0.

*War*.  JA672-86.  The government asked Risen no questions to establish venue in the Eastern District of Virginia, and it declined to call Risen at trial.[9]

As the district court would later observe, Risen's absence at trial was the product of "a policy decision that was made by the executive branch."  JA718.

### F.    The Trial

1.     Sterling's defense at trial was that he was not Risen's source.  His trial counsel identified a number of other potential suspects—including Sterling's former supervisor, Senate staffers, and Merlin—whom the government failed meaningfully to investigate.  *E.g*., JA903-20, 1745-1802, 2233-69.  Sterling's communications with Risen were explained as relating to Sterling's then-litigation against the CIA.  *E.g.,* JA2262-64.  Sterling did not testify.

At trial, the district court allowed the government to introduce (over Sterling's objection) the four classified documents that were seized from Sterling's Missouri home in 2006.  JA439-42, 539-43; *see* JA1815-28, 392-406; *Dkts. 336, 338*; *Aug. 30, 2011 CIPA Tr. at 51-56*; *Sept. 28, 2011 CIPA Tr. at 24-35*; *Oct. 13, 2011 CIPA Tr. at 37-42*.  Although those documents had nothing to do with the Program or the offenses charged, the government offered them to establish that Sterling's *modus operandi* was to retain classified CIA materials in whatever house

---

[9] The parties stipulated that, were Risen to testify at trial, he "would refuse to identify who was or was not an unnamed source" for *State of War* or any other publication.  JA2868-69.

he happened to be occupying. *See* JA342, 347-51, 429. The government persuaded the district court that this was an appropriate use of character evidence under Fed. R. Evid. 404(b). *See* JA439-42, 539-43; *Sept. 28, 2011 CIPA Tr. at 24-35*; *Oct. 13, 2011 CIPA Tr. at 37-42*.

The jury was instructed not to rely on those extrinsic materials to determine Sterling's guilt. JA2299-300. In its closing argument, however, the government drove home to the jury—three different times—that Sterling is "*a man who keeps CIA documents at his home*." JA2229-30 (emphasis added).

2. Sterling maintained before (and throughout) trial that venue for all but the Obstruction Count was improper in the Eastern District of Virginia.[10] *See* JA1025-26, 2108-17, 2188-89, 2337-43, 2374-83, 2399-431, 2476-88. Venue may lie only where an "essential conduct element" of the offense took place, and Sterling urged that no essential criminal conduct was shown to have occurred in the Eastern District of Virginia. The government offered no evidence that Sterling and Risen ever met in that district. Its only evidence implicating the Eastern District of Virginia comprised (i) a handful of phone calls, too brief (individually and collectively) for Sterling to have disclosed the facts contained in *State of War*;

---

[10] Venue for obstruction is proper in the district where the obstructed proceeding "was intended to be affected." 18 U.S.C. § 1512(i).

and (ii) the CNN Email—which, on its face, disclosed no classified information whatsoever. JA2801-02, 2815-22; *see* JA2374-83, 2399-431, 2476-88.

The district court declined to dismiss the non-obstruction counts for lack of venue, commenting that "there's enough smoke in this case" that the venue question could go to the jury. JA2116-17. The court then proceeded to give the jury an erroneous venue instruction: Rather than requiring the jury to find that *an essential conduct element* of the offense was committed in the Eastern District of Virginia, the court instead instructed the jury that it could find venue so long as "at least *one act in furtherance of that offense*" occurred within the district. JA2319 (emphasis added).

### G.    Sterling Is Convicted

After the close of the government's case, Sterling moved for a judgment of acquittal based on, among other things, improper venue. JA2077-78, 2399-431. The court dismissed the mail fraud count (Count VIII), but otherwise denied the motion. JA2101-08, 2181.

In its third day of deliberations, the jury notified the court that it was deadlocked on several counts. JA2386-87. The court directed the jury to continue deliberating. JA2388-90. The jury later returned guilty verdicts on all counts. JA2391-97.

Sterling was sentenced to forty-two months' imprisonment on all counts, to be served concurrently. JA2492-96. Sterling is serving his sentence.

## SUMMARY OF ARGUMENT

I.     The non-obstruction counts should be reversed because the government failed to prove venue in the Eastern District of Virginia. Venue is proper only where the defendant committed an "essential conduct element" of the crime. The government failed to offer non-speculative evidence that Sterling committed any essential criminal conduct in the Eastern District of Virginia.

The Risen Counts and Attempt Counts were predicated on Sterling's disclosure of national-defense information to Risen. Although the government's theory was that Sterling disclosed that information at an in-person meeting, it offered no evidence that such meeting occurred in the Eastern District. Its only evidence implicating the Eastern District comprised seven telephone calls between Sterling and Risen, totaling four minutes and eleven seconds, and a single email from Sterling to Risen that did not discuss the Program or otherwise disclose any classified information.

The Retention Count charged Sterling with unlawfully possessing the Cover Letter within the Eastern District. The government had no direct evidence that ever happened. The government instead introduced peripheral character evidence—four classified documents that were recovered from Sterling's Missouri

home—as evidence that Sterling had a habit of retaining classified materials in every house he occupied. That prejudicial character evidence never should have been admitted in the first place (*infra* Section IV), but, in any event, it offered no non-speculative basis upon which the jury could base a venue finding.

As for the Book Counts, the government has urged that venue was proper simply because *State of War* was distributed and sold within the district. The Court should reject that argument. Because Sterling and Risen were not charged as (nor alleged to be) conspirators, Risen's acts of causing the publication and sale of his book in the district should not be imputed to Sterling. What is more, the government's boundless theory would support nationwide venue for many crimes—a result inconsistent with both the letter and spirit of the Constitution's venue provisions.

II. If any of the non-obstruction counts are not reversed outright, then those counts should be remanded for a new trial because the district court gave the jury an erroneous venue instruction. Rather than instructing the jury that it needed to find an "*essential conduct element*" to have occurred in the district, as the law requires, the court instructed the jury to find venue so long as an "*act in furtherance*" of the crimes occurred in the district. Not only did that instruction misstate the law, but it allowed the jury to find venue so long as mere "preparatory

acts" occurred within the Eastern District of Virginia. This Court and others have long held that preparatory acts, standing alone, cannot sustain venue.

III.    The Obstruction Count should be reversed because the government failed to prove that Sterling acted with the requisite intent to obstruct an official proceeding.    The only official proceeding that Sterling was alleged to have obstructed is the federal grand jury's investigation, which Sterling is said to have obstructed by deleting the CNN Email from his Hotmail account.    However, Sterling was unaware of the grand jury's investigation until June 16, 2006.    The government's evidence established, at most, that someone—perhaps Sterling— deleted this email at some point prior to July 14, 2006.    The jury could only speculate that Sterling deleted the email after June 16.    Further, because the grand jury's subpoena did not request the email in question, the jury could only speculate that Sterling deleted that email with the specific intent to obstruct the grand jury.

IV.    At a minimum, Sterling's convictions should be reversed and the case remanded for a new trial because the district court erroneously admitted prejudicial character evidence in violation of Fed. R. Evid. 404(b).    In particular, the court allowed the government to introduce four classified documents that were seized from Sterling's Missouri home as evidence that Sterling had a custom and practice of removing classified materials from CIA offices and retaining them in his home. Those documents had nothing to do with the Program (or any other operational

program), Iran, nuclear weapons, Risen, or any of the offenses charged. Their sole purpose was to establish Sterling's propensity to mishandle classified materials—precisely what Rule 404(b) forbids.

## ARGUMENT

### I. THE NON-OBSTRUCTION CONVICTIONS SHOULD BE REVERSED BECAUSE THE GOVERNMENT FAILED TO PROVE VENUE IN THE EASTERN DISTRICT OF VIRGINIA

1. The gravamen of the government's case was that Sterling disclosed to Risen the Cover Letter and other information about the Program. Where did Sterling do that? The government had no idea. It prosecuted him in the Eastern District of Virginia, where venue was proper for the Obstruction Count,[11] but the government offered virtually no evidence to establish venue in that district for the non-obstruction counts. It acknowledged before trial that Risen's testimony on this question would be critical, because "the jury should not have to rely on guesswork" to make a venue finding. JA209; *see* JA323-24, 332. The government was right about that. But it never called Risen at trial and, when the dust settled, it was left with no non-speculative evidence to support venue in the Eastern District of Virginia. The non-obstruction counts should be reversed.

---

[11] As stated above, venue was proper for the Obstruction Count. Sterling's conviction for obstruction should be reversed, however, because there was insufficient evidence to support it. *See infra* Section III.

The Court reviews this question *de novo*. *See United States v. Jefferson*, 674 F.3d 332, 364 (4th Cir. 2012).

2. Few rights are so fundamental as a defendant's right to stand trial in the correct venue.[12] Proper criminal venue was of such moment to the Founders that "[t]he Constitution twice safeguards the defendant's venue right." *United States v. Cabrales*, 524 U.S. 1, 6 (1998). Article III commands that trial "shall be held in the State where the said Crimes shall have been committed" (§ 2, cl. 3), and the Sixth Amendment promises a trial "by an impartial jury of the State and district wherein the crime shall have been committed."

Given its constitutional pedigree, venue is narrowly construed in criminal cases. *United States v. Johnson*, 323 U.S. 273, 276 (1944). The government must prove venue separately as to each count, and must do so by a preponderance of the evidence. *United States v. Ebersole*, 411 F.3d 517, 524 (4th Cir. 2005).

Where (as here) the statute defining the substantive offense is silent on the issue, proper venue is determined by the *locus delicti* of the crimes charged. *See United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999). This Court has described a "twofold" inquiry:

> We must 'initially identify the conduct constituting the offense,' because venue 'on a count is proper only in a district in which an *essential conduct*

---

[12] *See* THE DECLARATION OF INDEPENDENCE para. 21 (U.S. 1776) (objecting to the Crown's "transporting us beyond Seas to be tried for pretended offences").

*element* of the offense took place.'   We must then determine *where* the criminal conduct was committed.

*United States v. Smith*, 452 F.3d 323, 334-35 (4th Cir. 2006) (internal citations omitted; emphases added).

The touchstone, then, is where an "essential conduct element" of the crime occurred.  Notably, venue does not lie where just any "essential element" occurred. Criminal statutes often contain elements that, while necessary to establish guilt, are not "*conduct*" elements—such as a requirement that the defendant act with a particular state of mind.  Such elements are ignored for purposes of venue; what matters is the *conduct* that is proscribed.  *E.g.*, *United States v. Bowens*, 224 F.3d 302, 313-14 (4th Cir. 2000).  Accordingly, "proper venue is limited to the place where the defendant's criminal acts [were] committed."  *Id.* at 312; *see United States v. Umana*, 750 F.3d 320, 334 (4th Cir. 2014).

An important corollary of the "essential conduct element" test is that mere "preparatory acts" cannot sustain venue.  *E.g.*, *United States v. Ramirez*, 420 F.3d 134, 141 (2d Cir. 2005); *United States v. Strain*, 396 F.3d 689, 697 (5th Cir. 2005); *United States v. Tingle*, 183 F.3d 719, 726 (7th Cir. 1999).  Simply put, venue exists where a crime is committed—and a crime is not committed until it is actually *committed*.  Acts that are "merely prior and preparatory to [the] offense," such as telephone calls made or mailings sent in preparation for a crime, are "not part of the offense" and accordingly irrelevant to the venue inquiry.  *United States*

*v. Beech-Nut Nutrition Corp*., 871 F.2d 1181, 1189-90 (2d Cir. 1989); *accord United States v. Perlitz*, 728 F. Supp. 2d 46, 57-58 (D. Conn. 2010).

3.      The government failed to prove that Sterling committed any essential conduct elements of the non-obstruction counts in the Eastern District of Virginia.

*Risen Counts and Attempt Counts*.  The Risen Counts charged Sterling with willfully communicating national-defense information about the Program, including the Cover Letter, to Risen.  *See* JA2300-06 (jury instructions).  The Attempt Counts charged Sterling with attempting to communicate that same information to the general public through Risen's never-published 2003 newspaper article.  *Ibid*.  The government offered no evidence (and never argued) that Sterling was somehow involved in the drafting of that newspaper article.  Rather, its theory was that Sterling attempted to cause *Risen* to communicate that information to the general public, and that Sterling made such attempt by giving the information to Risen in the first place.  Accordingly, as charged, the essential conduct elements of the Risen and Attempts Counts are identical:  Sterling must have *communicated*, *delivered*, *transmitted*—or *caused* to be communicated, delivered, or transmitted— the Cover Letter and information about the Program to Risen.  The jury was so instructed.  *Ibid*.

The jury heard precious little to suggest that this essential conduct took place in the Eastern District of Virginia.  The government offered no evidence that

Sterling mailed, emailed, or otherwise transmitted any national-defense information to Risen from the Eastern District of Virginia. *E.g.*, JA2038-55, 2065. It offered no evidence that Risen ever *received* any national-defense information in the Eastern District. *E.g.*, JA322 ("There are no recorded telephone calls in which Sterling discloses classified information to Risen, nor are there emails in which Sterling discloses the same."). The government introduced phone records showing that Sterling and Risen exchanged only seven phone calls, totaling four minutes and eleven seconds, while Sterling was living in Virginia. *See* JA2801-02. But, of course, Sterling could not physically have given the Cover Letter to Risen over the phone. And the government never argued that Sterling could have disclosed anything of substance about the Program on those calls, the *longest* of which was 91 seconds. *See ibid*.

Given the realities of its case, the government's theory all along was that Sterling communicated national-defense information to Risen at an in-person meeting. *E.g.,* JA42. The theory was plausible: when Sterling was living in Herndon, Virginia, Risen lived in Gaithersburg, Maryland (30 miles from Herndon), and maintained an office in Washington, D.C. (24 miles). *See* JA2801-14, 1846-47. But the government offered no evidence that Sterling and Risen ever met (if at all) in the Eastern District of Virginia. Risen emailed Sterling in December 2003, several months *after* Sterling moved to Missouri, to request an in-

person meeting[13]—but the government offered no evidence that Sterling and Risen in fact met, or where. The FBI's lead investigator candidly admitted that she did not know "where or when Mr. Risen or Mr. Sterling met or what they ever discussed." JA2055; *see* JA2065.

Sterling and Risen exchanged only a single email while Sterling was living in Virginia: the CNN Email, which Sterling forwarded to Risen on March 10, 2003. JA2801. The CNN Email did not "communicate, deliver, or transmit" national-defense information to Risen—the government has never argued otherwise—and therefore does not support venue in the Eastern District of Virginia. In fact, viewed most charitably to the government, the CNN Email suggests that Sterling and Risen may have *already* discussed the Program by March 10, 2003. But Sterling's only telephone contact with Risen prior to March 10 was a single phone call lasting 50 seconds. *Ibid.* Perhaps the jury could have inferred that Sterling and Risen spoke briefly to arrange for an in-person meeting. But there was not a whisper of evidence to support a finding that Sterling and Risen met in the Eastern District of Virginia—as opposed to Maryland, the District of Columbia, or New York for that matter.

For venue, "[t]he location of the criminal acts is determinative." *Umana*, 750 F.3d at 334. And, as the government has conceded, "there is no direct

---

[13] JA2803 ("can we get together in early january? jim").

evidence, other than Risen's testimony, that establishes where the substantive disclosures of classified information occurred." JA324. The government's evidence to support venue for the Risen and Attempt Counts—seven moments-long telephone calls, and a single email that did *not* communicate classified information—does not support a finding that Sterling committed a crime in the Eastern District of Virginia. Given their duration, those phone calls were, at most, "preparatory acts for the commission of the actual crime—much like purchasing a gun and traveling to a bank to commit a robbery—and thus insufficient to support a finding of venue." *Strain*, 396 F.3d at 697; *see Ramirez*, 420 F.3d at 141.

*Retention Count*. The Retention Count charged Sterling with retaining the Cover Letter after he left the CIA until he allegedly gave it to Risen. As relevant here, the essential conduct elements are that Sterling "had unauthorized possession or control" and "willfully retained" the Cover Letter after leaving the CIA. JA2313-14 (jury instructions). The operative question, then, is where Sterling "*possessed*," "*controlled*," or "*retained*" the Cover Letter.

Again, the government failed to show that Sterling committed this essential conduct in the Eastern District of Virginia. Its argument was simply that Sterling lived in Herndon immediately after he left the CIA, and therefore he *must* have possessed the Cover Letter in Herndon at some point. JA2229-30. Doubling down on this venue-by-vicinity theory, the government unearthed the four decades-old

CIA documents that were seized from Sterling's Missouri home as evidence that Sterling had a *modus operandi* "of maintaining CIA material at his home, moving it from one residence to the next." JA2463.

It is said that necessity is the mother of invention, and the government's reinvention of the Federal Rules of Evidence is proof. Rule 404(b) forbids the use of extrinsic evidence to prove a defendant's criminal propensity. That was precisely the government's purpose here: Sterling mishandled CIA materials once, which means he probably did so with the Cover Letter. As explained in Section IV below, the district court's erroneous admission of those documents is an independent basis to vacate Sterling's conviction.

But even assuming the four documents seized from Sterling's Missouri home were admissible, they offered no non-speculative basis for the jury to find that Sterling possessed the Cover Letter in Herndon several years earlier. The government's theory was that the mere presence of these documents in Sterling's Missouri home in 2006 is evidence that Sterling had a *modus operandi*, dating back to at least 2002, of unlawfully retaining classified documents in whatever house he happened to be occupying. To articulate this theory is to refute it. The government's impossibly broad rule would all but dismantle the venue requirement for crimes of possession: the government could argue, for instance, that a defendant arrested carrying an unlicensed firearm in Florida has "a '*modus*

*operandi*' of carrying illegal firearms on his person"—and proceed to try him in any district he previously set foot.

At bottom, the government urges a presumption that a defendant charged with unlawfully possessing an item can be presumed, for venue purposes, to have possessed that item within the district of his residence. Courts have rejected similar attempts to dilute the constitutional venue requirement. In *United States v. Evans*, venue was held to be improper because the government offered "entirely circumstantial evidence" to establish something the prosecution had simply taken for granted: that the defendant's residence was located in Kansas. 318 F.3d 1011, 1022 (10th Cir. 2003). Upon realizing its oversight, the government argued that the jury still could have found venue because every official who had investigated the defendant, and searched his residence, was a member of Kansas state and local law enforcement. *Id*. at 1021-22. The Tenth Circuit rejected that argument. Because proving venue is the *government's* burden, the court refused to indulge any "presumption" that, for venue purposes, "law enforcement officers of a particular jurisdiction act within that jurisdiction." *Ibid*.[14]

---

[14] *See also United States v. Greene*, 995 F.2d 793, 800-01 (8th Cir. 1993) (jury's venue finding "could have been reached only by speculation" where defendant had "located seven of his marijuana fields" on a state map, and DEA agent then "put a small pinhole" in the places indicated, but map presented at trial contained pinholes "distributed both inside and outside" the district); *United States v. Passodelis*, 615 F.2d 975, 977-78 (3d Cir. 1980) (government failed to prove

Because there is no non-speculative evidence that Sterling possessed the Cover Letter in the Eastern District of Virginia, and because the law does not countenance any presumption that he did, the Retention Count should be reversed.

*Book Counts*.  The Book Counts charged Sterling with causing Risen to convey information about the Program, including the Cover Letter, to the general public through *State of War*.  The government did not charge that Sterling had any involvement in *State of War*'s drafting or publication, or that Sterling himself disclosed any classified information to the general public.  No—the government's theory was that Sterling caused *Risen* to convey classified information to the general public, and that Sterling did so by providing that information to Risen in the first place.  Accordingly, the essential conduct elements are identical to the Risen and Attempt Counts: Sterling must have "*communicated*, *delivered*, *transmitted*, or *conveyed*" national-defense information to Risen, thereby "*causing*" him to write and publish *State of War*.  *See* JA2300-17 (jury instructions).

Again, the government failed to establish that Sterling communicated or transmitted any national-defense information to Risen within the Eastern District of Virginia.  *E.g.*, JA2038-55, 2065.  As with the Risen and Attempt Counts, the

venue for charge of making illegal contributions where defendant "could not remember exactly" whether it was he, or another gentleman, who brought campaign checks into the relevant district).

government's only evidence that Sterling communicated *anything* to Risen within the Eastern District of Virginia was a handful of brief telephone calls, and the CNN Email. That will not do.

In briefing below, the government argued that venue for the Book Counts nevertheless was proper because *State of War* was distributed and sold within the Eastern District of Virginia.[15] JA2460-63. In other words, because *Risen* engaged in conduct (selling his book) in the Eastern District of Virginia, the government insisted that *Sterling* could be hauled there for trial.

The Court should reject the government's venue-by-imputation theory. For starters, this theory is at odds with how the government charged and tried this case. The government chose not to charge Sterling under the conspiracy provision of 18 U.S.C. § 793, which is found in subsection (g).[16] Instead, it charged him under the *substantive* provisions of the statute (subsections (d) and (e)). Because Sterling

---

[15] The government introduced business records showing that copies of *State of War* were shipped from Barnes & Noble's distribution center in New Jersey to bookstores in Virginia, where they were sold. JA2842-48. The government also offered the testimony of Julia Perriello, a hairdresser from Alexandria, who testified that she bought a copy of *State of War*—"[p]ossibly" in Virginia, or perhaps in Bowie, Maryland. JA1885-87. Ms. Perriello "think[s]" she read the book in Virginia. *Ibid*.

[16] *See* 18 U.S.C. § 793(g) ("If two or more persons conspire to violate any of the foregoing provisions of this section, and one or more of such persons do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be subject to the punishment provided for the offense which is the object of such conspiracy.").

and Risen were not charged as (or shown to be) coconspirators, Risen's acts—and those of Risen's publisher and Barnes & Noble, for that matter—should not be imputed to Sterling for venue purposes. *See Bowens*, 224 F.3d at 311 n.4 (to determine venue, the court looks to "the conduct of the defendant" as well as "the conduct of anyone with whom he shares liability as a principal"). *Cf. United States v. Foy*, 641 F.3d 455, 467-68 (10th Cir. 2011) (rejecting "venue by imputation" theory where "the crime charged does not require concerted activity").

More than that, the government's sweeping theory ignores the principle that criminal venue must be narrowly construed. If the government were correct, then Sterling could have been tried in any district where *State of War* was sold, and likely even districts through which interstate shipments of books passed en route to their ultimate destinations—that is, virtually any district the whole nation over. The government admitted as much in briefing below. *See* JA2461-62. This boundless theory of venue flouts the constitutional promise that a defendant shall stand trial for his crimes in the district in which he commits them. *See Johnson*, 323 U.S. at 278. *Cf. United States v. Hernandez*, 189 F.3d 785, 791 (9th Cir. 1999) (cautioning against allowing "venue [to] become the 'government's choice' rather than a constitutional guarantee").

## II. THE NON-OBSTRUCTION COUNTS SHOULD, AT A MINIMUM, BE REMANDED BECAUSE THE DISTRICT COURT GAVE THE JURY AN ERRONEOUS VENUE INSTRUCTION

If Sterling's convictions on any of the non-obstruction counts are not reversed outright, then those counts should be remanded for a new trial. The district court erroneously instructed the jury that it could find venue for those counts so long as "at least one act in furtherance of" the crimes occurred in the Eastern District of Virginia—meaning the jury could find venue so long as phone calls or other preparatory acts occurred in the district. *See* JA2319. That is not the law. The error was prejudicial and warrants reversal.

The Court reviews that jury instruction for abuse of discretion. *United States v. Ebersole*, 411 F.3d 517, 526 (4th Cir. 2005). "By definition, a court 'abuses its discretion when it makes an error of law.'" *Ibid*.

### A. The District Court Erroneously Instructed The Jury That It Could Find Venue If Mere "Preparatory Acts" Occurred In The District

1. After the close of evidence, the government submitted to the district court a proposed jury instruction on venue. Its proposed instruction provided that the government was required to prove that "it is more likely than not that the charged offense[s] occurred in the Eastern District of Virginia." JA1904. Although the government's instruction failed to specify that, for venue purposes, an offense "occurs" only where an essential conduct element occurs, it at least

conveyed the bedrock principle that venue is proper only where a *crime* is committed.

The district court rejected the government's instruction in favor of its own formulation. Operating under the mistaken belief that the "essential conduct elements" test was no longer the law,[17] the court instead instructed the jury that venue was proper so long as "at least one act in furtherance" of the offense occurred within the district. JA2108-12, 2319. Sterling objected to that instruction several times—pointing out that the "essential conduct elements" test was still, very much, the law. JA2108-12, 2332-33, 2337-43, 2344-47, 2374-83.

After the case went to the jury, Sterling filed a renewed motion for acquittal based on improper venue. JA2374-83. In a colloquy with the district court and the government, Sterling reiterated that venue was proper only where an "essential conduct element" was committed, *not* anywhere an "act in furtherance" of the crime happened to occur. JA2337-42. The government demurred, responding that "if we are to revise the instruction now, we can't go back and reargue the case." JA2342. "I think at this point, if it's error, it's error, and we'll find out at some point if the defendant is convicted." *Ibid*.

---

[17] JA2111 ("[Sterling's attorneys] are citing some, some case law from the Fourth Circuit. Let's see, the *Bowens* case. It says there venue on a count is proper only in a district in which an essential, an essential conduct element of the offense took place. I don't think that's the law any longer.").

2.     It's error.  The district court's venue instruction was inconsistent with settled Supreme Court and Fourth Circuit precedent holding that venue is proper only where an "essential conduct element" of the offense occurred.  *See Rodriguez-Moreno*, 526 U.S. at 279; *Jefferson*, 674 F.3d at 339; *Bowens*, 224 F.3d at 309.  The district court's belief that this was no longer the law (JA2111) was mistaken, and its jury instruction was wrong.

An "essential conduct element" and an "act in furtherance" of a crime are not the same thing.  One can act "in furtherance" of a crime in any number of ways, including by making phone calls or assembling materials in preparation for a crime.  As discussed above (*supra* pp. 21-25), courts have long held that such "preparatory acts" cannot sustain venue.  *E.g., Reass v. United States*, 99 F.2d 752, 755 (4th Cir. 1938) (acts "preparatory to the commission of the crime," such as the "assembling" and "arrangement in a written composition" the false statements at issue, "were no part of the crime itself" and insufficient to create venue); *see Ramirez*, 420 F.3d at 141.  *Cf. Jefferson*, 674 F.3d at 368 (district court erred by relying on defendant's "acts directly or causally connected to the wire transmission" to support venue for wire fraud).

The *Strain* case is instructive.  396 F.3d at 694.  There, Mrs. Strain was charged with "harbor[ing] or conceal[ing]" her fugitive husband in violation of 18 U.S.C. § 1071.  The government prosecuted her in the Western District of Texas,

where she had spoken by telephone to her husband, "made plans to meet and harbor [him]," then jumped in her car and driven to a motel in Carlsbad, New Mexico—where the ultimate "harboring" occurred. *Id*. at 691-92, 696. After Mrs. Strain was convicted, she argued on appeal that venue was improper in the Western District of Texas. *Ibid*. The Fifth Circuit agreed. *Id*. at 697. Judge Jolly explained:

> Strain's telephone conversations with [her husband] and subsequent journey through the Western District of Texas toward Carlsbad, although indispensable to the ultimate act of harboring in New Mexico, were preparatory acts for the commission of the actual crime—much like purchasing a gun and traveling to a bank to commit a robbery—and thus insufficient to support a finding of venue.

*Ibid*.[18]

Indeed, if mere "acts in furtherance" of a crime could support venue, then this Court's decision in *United States v. Stewart* would have gone the other way. 256 F.3d 231 (4th Cir. 2001). There, the defendant was convicted in the Eastern District of Virginia for money laundering. *Id*. at 236-38. This Court reversed,

---

[18] *Accord United States v. Tzolov*, 642 F.3d 314, 318-19 (2d Cir. 2011) ("At most, catching flights from the Eastern District [of New York] to meetings where Butler made fraudulent statements were preparatory acts. They were not acts 'constituting' the violation."); *Beech-Nut*, 871 F.2d at 1189-91 (telephone calls and mailings ordering adulterated fruit juice "were merely preparatory to the eventual introduction of [that] juice into commerce" and therefore did not create venue); *United States v. Perlitz*, 728 F. Supp. at 57-61 (defendant's "preparatory acts" in Connecticut—maintenance of a residence, obtaining funding, booking travel, and traveling by car from Connecticut to JFK Airport—"all precede, and are not part of, his travel[] in foreign commerce" and therefore cannot support venue).

holding venue was improper because the essential conduct elements of the crime had occurred in California. *Id*. at 240-41. Even though acts "in furtherance of" the crime undoubtedly occurred in the Eastern District—including the deposit (and later withdrawal) of the to-be-laundered funds from a Western Union in the district—the Court held that those acts were "of no moment" because the defendant's criminal conduct, the laundering itself, occurred entirely in California. *Ibid*.

3. Of course, there are instances where acting "in furtherance of" a crime is tantamount to committing the crime itself. *E.g.*, *Tzolov*, 642 F.3d at 318-19. The crime of conspiracy, for example, is complete when a conspiratorial agreement exists and an overt act is committed by one coconspirator *in furtherance of* that conspiracy. *See United States v. Caudle*, 758 F.2d 994, 997-98 (4th Cir. 1985). For that reason, venue for conspiracy is proper anywhere "an act in furtherance" of the conspiracy occurred. *See United States v. Smith*, 452 F.3d 323, 335 (4th Cir. 2006); *United States v. Day*, 700 F.3d 713, 727 (4th Cir. 2012) ("[S]imple acts such as phone calls from a district can give rise to venue in conspiracy cases."). This is not an exception to the "essential conduct elements" rule, but an application of it: Because to act "in furtherance of" the conspiracy is to commit the crime itself, venue is proper in any district where an "act in furtherance" occurs—even if the defendant never personally set foot in that district. *See Smith*, 452 F.3d at 335

("[P]roof of acts by one co-conspirator can be attributed to all members of the conspiracy").

The district court misunderstood that principle. In articulating its belief that the "essential conduct elements" test had been abrogated (JA2108-11), the district court referred to the *Ebersole* case, where this Court endorsed a venue instruction similar to the instruction given here. 411 F.3d at 525-32. But *Ebersole* did not abrogate the "essential conduct elements" test. Rather, it stands only for the unremarkable proposition that some crimes, like conspiracy, are committed when acts are taken "in furtherance of" them. In *Ebersole*, the court's venue instruction was proper on the facts of that case: For one of the charges (wire fraud), an essential conduct element was "causing a wire to be transmitted *in furtherance of* a fraud." *Id*. at 527. For the other charge (presentment of false claims), the trial court proceeded to explain to the jury precisely what it meant by an "act in furtherance":

> [I]t is sufficient for venue purposes if the claim that allegedly was false passed through the Eastern District of Virginia before coming to the final office where it was paid. It is equally sufficient for venue purposes if the claim that allegedly was false was submitted initially to a department or agency located in another judicial district, an[d] then, in the normal course of business, was sent to an office within the Eastern District of Virginia for payment.

*Id*. at 530.

This Court affirmed because the jury instruction "adequately reflected the[] legal principle[]" that the crime of presenting false claims does not conclude when the defendant first presents a false claim. *Id*. at 532-33 (citing *United States v. Candella*, 487 F.2d 1223 (2d Cir. 1973)). Rather, the crime continues (and venue is proper) in any district into which that false claim is subsequently routed. *Ibid.* *Ebersole* did not rewrite the Supreme Court's "essential conduct elements" test, did not endorse the use of a sweeping "act in furtherance of" instruction for other types of crimes, and *certainly* did not abrogate the settled rule that preparatory acts and other non-essential conduct taken "in furtherance of" a crime cannot sustain venue.

Here, the district court's instruction was erroneous because it advised the jury that any act remotely related to the crime—even a three-second phone call between Sterling and Risen (JA2802)—could support venue.[19] In *United States v. Georgacarakos*, the First Circuit rejected an identical venue instruction precisely

---

[19] Perhaps realizing its error, the district court would later respond to a question from the jury by clarifying that venue for the Retention Count required proof that "the *willful retention* occurred in the Eastern District of Virginia." JA2364-72 (emphasis added). That second instruction was improved from the first one, but because the two contradicted one another the latter instruction does not forestall a remand of the Retention Count. *See United States v. Varner*, 748 F.2d 925, 927 (4th Cir. 1987) ("Where two instructions are in conflict, and one is an incorrect statement of the law and is clearly prejudicial, the charge constitutes reversible error, since the jury 'might have followed the erroneous instruction.'"); *United States v. Walker*, 677 F.2d 1014, 1016 (4th Cir. 1982). The district court never attempted to correct its venue instructions for the non-retention counts.

because it could have allowed the jury to find venue based on "preparatory acts" alone. 988 F.2d 1289, 1294 (1st Cir. 1993). There, the trial court had instructed the jury that it could find venue for possession and distribution of narcotics so long as the "*defendant did any act in Maine in furtherance of this crime*." *Ibid*. The court of appeals soundly rejected this "overly broad and erroneous" instruction:

> The emphasized language, which is challenged by the defendant, appropriately describes venue for a conspiracy charge or for aiding and abetting others in commission of a crime. Group crimes, such as conspiracy and aiding and abetting, may have a broad scope of conduct relevant to venue due to multiple participants and the participatory nature of the crimes. *In individual crimes, such as distribution and possession with the intent to distribute cocaine, "actions in furtherance of the crime" could be interpreted by a jury to include conduct other than possessing and distributing cocaine which is merely preparatory or prior to the crimes.*

*Ibid*. (emphasis added; internal citations omitted).

## B.    The Error Was Not Harmless

The district court's venue instruction was prejudicial. Among the government's most damning evidence connecting Sterling to Risen, and practically the *only* evidence connecting both of them to the Eastern District of Virginia, were seven telephone calls consuming little more than four minutes total. JA2801-02. Perhaps the jury found that Sterling provided national-defense information to Risen in those four minutes. Or—more likely—the jury may instead have found that those calls were simply "in furtherance of" Sterling's crime. If the former, venue was properly found. If the latter, it was not.

Likewise, even if the government were correct that *State of War*'s publication (for the Book Counts) and Sterling's residence in Herndon (for the Retention Count) were venue-sustaining acts, we have no way of knowing whether the jury in fact made such a finding. The jury might instead have accepted the district court's invitation to find only that an act—*any* act—in furtherance of those crimes occurred in the Eastern District of Virginia. The non-obstruction counts therefore must be remanded. *See United States v. Miller*, 111 F.3d 747, 753-54 (10th Cir. 1997) (even though "the government asserts there is substantial evidence in the record to establish venue," reversal is necessary because "our speculation as to the verdict a jury might reach may not substitute for an actual jury verdict").

## III. THE OBSTRUCTION CONVICTION SHOULD BE REVERSED BECAUSE THERE IS NO EVIDENCE THAT STERLING INTENTIONALLY OBSTRUCTED THE GRAND JURY PROCEEDING

1. Sterling was convicted of obstructing justice. *See* 18 U.S.C. § 1512(c). The government's theory was that Sterling deleted the CNN Email with the intent to obstruct the grand jury's investigation. Its evidence consisted of the following: (i) Sterling learned of the grand jury's investigation when he received a subpoena on June 16, 2006; and (ii) Hotmail's "snapshots" revealed that the CNN Email existed in April 2006, but not in July 2006. From this, the government argued that Sterling *must* have deleted the CNN Email, he must have done so *after*

he learned of the grand jury's investigation, and he must have done so with the corrupt intent to obstruct that proceeding.

Sterling's conviction on the Obstruction Count should be reversed. Viewed most charitably to the government, the record suggests only that Sterling (or perhaps Hotmail) deleted the CNN Email at some point prior to July 2006. The government offered no evidence to establish that Sterling deleted the email *after* he learned of the grand jury's investigation—much less that he did so with the requisite intent to obstruct that investigation.

Sterling moved for a judgment of acquittal on this count, JA2399-431, which the court denied, JA2102-03. This Court reviews that denial *de novo*. *United States v. Howard*, 773 F.3d 519, 525 (4th Cir. 2014). The relevant question is whether, viewing the evidence most favorably to the government, "substantial evidence supports the verdict." *Ibid*.

2.    In relevant part, Section 1512(c) proscribes the "corrupt" destruction or concealment of a document, with the "intent to impair [its] integrity or availability" at an "official proceeding."[20]  18 U.S.C. § 1512(c)(1); *see* JA2317-18 (jury instruction). Taken together, the statutory requirements that the defendant act "corruptly" and with the "intent to impair" impose a strict *mens rea* requirement:

---

[20] The statute defines "official proceeding" as, *inter alia*, "a proceeding before … a Federal grand jury." *See* 18 U.S.C. § 1515.

the defendant "must believe that his acts will be likely to affect a pending or foreseeable [official] proceeding." *United States v. Matthews*, 505 F.3d 698, 708 (7th Cir. 2007). "[I]f the defendant lacks knowledge that his actions are likely to affect" a particular official proceeding, then "he lacks the requisite intent to obstruct." *Arthur Andersen LLP v. United States*, 544 U.S. 696, 708 (2005); *accord United States v. Reich*, 479 F.3d 179, 185-86 (2d Cir. 2007); *United States v. Phillips*, 583 F.3d 1261, 1263-64 (10th Cir. 2009).

It is axiomatic that a defendant cannot "intentionally" obstruct a proceeding of which he is ignorant. *E.g., United States v. Friske*, 640 F.3d 1288, 1292-93 (11th Cir. 2011). Although an official proceeding need not be pending at the time of the obstructive acts (18 U.S.C. § 1512(f)), it "must at least be 'foreseen,' such that the defendant has *in contemplation some particular official proceeding* in which the destroyed evidence might be material." *United States v. Simpson*, 741 F.3d 539, 552 (5th Cir. 2014) (emphasis added); *see United States v. Petruk*, 781 F.3d 438, 445 (8th Cir. 2015) (collecting cases).

3.     The Obstruction Count founders on that state-of-mind requirement. As a threshold matter, the government's evidence that Sterling deleted the CNN Email between April and July of 2006 was threadbare. The totality of its evidence was that Hotmail's April 2006 snapshot contained the email, and its July 2006 snapshot did not. That's it. The government offered no evidence regarding when

the email was deleted, or from what folder in Sterling's email account. Nor did the government offer any evidence regarding Hotmail's retention policies at that time. Perhaps Sterling deleted the email *before* the April 2006 snapshot, but it remained on Hotmail's server for a period of time before being permanently deleted by Hotmail.[21] Or, perhaps Sterling did not delete the email at all—perhaps his account reached its maximum storage capacity in 2006, and Hotmail automatically deleted the oldest messages in his mailbox.[22] We cannot know, because the government offered no evidence on the subject.

The government's First It Was There, Then It Was Not theory of obstruction gets more tenuous still. Thin as the evidence was that Sterling deleted the CNN Email between April and July, there was no evidence—none—that Sterling did so *after* he learned of the grand jury's investigation. It is undisputed, as the

---

[21]  *E.g.*, Yahoo! Help Page, https://help.yahoo.com/kb/SLN3603.html ("Yahoo Mail regularly deletes the contents of the Trash folder. This is not a setting you can change."); Microsoft How-to, http://windows.microsoft.com/en-us/windows/outlook/recover-deleted-messages (cautioning Outlook users that "the Deleted folder gets cleaned out periodically" by Microsoft).

[22]  *E.g.*, Greg Shultz, *Build Your Skills: Archive Hotmail Messages in Outlook Express*, April 3, 2003, http://www.techrepublic.com/article/build-your-skills-archive-hotmail-messages-in-outlook-express/ (reporting that, as of 2003, "Microsoft [had] recently instituted a storage space policy on its free MSN Hotmail accounts that deletes your saved e-mail once your account reaches the specified size limit.").

government told the jury more than once,[23] that Sterling was not aware of that investigation until June 16, 2006, when he received the grand jury's subpoena. The government never argued (nor did it offer evidence) that Sterling somehow "foresaw" the grand jury proceeding prior to that date. *See Friske,* 640 F.3d at 1292. Accordingly, to support a finding that Sterling acted with the specific intent to obstruct the grand jury's investigation, the government was required to prove beyond a reasonable doubt that Sterling deleted the email *after* June 16. *See id.*; *Petruk*, 781 F.3d at 446.[24]

The government offered no such evidence. The closest it came was to argue, in closing statements, that Sterling *must* have deleted the CNN Email after receiving the grand jury subpoena, because why else would the email have gone missing three-plus years after it was sent? *See* JA2231. The government did not explain why the June 16 subpoena would have been so alarming as to prompt

---

[23] *See* JA2101 ("What's important about the service of that subpoena is … that it puts the defendant on notice that the FBI is investigating."); JA2231 (the April 2006 snapshot was "before the defendant knew any idea [sic] that there was an FBI investigation, that there was a grand jury investigation."); *see also* JA62; JA1965.

[24] *See also United States v. Ryan*, 455 F.2d 728, 734 (9th Cir. 1971) (holding that "intent [to obstruct justice] was not established beyond a reasonable doubt" where defendant had instructed secretary to begin destroying records *before* he received grand jury subpoena); *United States v. Sun Myung Moon*, 718 F.2d 1210, 1236 (2d Cir. 1983) (reversing obstruction conviction where documents produced to grand jury were fraudulently backdated *before* grand jury had requested them, and there was "no evidence of [defendant's] corrupt intent" in producing those documents to the grand jury).

Sterling to delete old emails, when Sterling had been aware since 2003 that the FBI was investigating the Risen leak. Nor did the government explain why the subpoena must have driven Sterling to delete the CNN Email, yet not to dispose of the four classified documents sitting in his house.

At any rate, it makes little difference that the government's theory was internally inconsistent. What matters is that it was unsupported. The jury may not "bridg[e] an evidentiary gap with rank speculation," *Goldsmith v. Witkowski*, 981 F.2d 697, 703 (4th Cir. 1992), and that is what the government asked of the jury here. Because the government offered no proof that Sterling "knew of, or at least foresaw, the [grand jury] proceeding" when the CNN Email was deleted— whenever that was—the government failed to carry its burden of proof. *See Friske*, 640 F.3d at 1292.

4. Even if the jury could have found beyond a reasonable doubt that Sterling deleted the CNN Email, and that he did so after June 16, 2006, the Obstruction Count still should be reversed because there was no evidence that Sterling deleted the email with the specific intent to *obstruct* the grand jury. *See United States v. Aguilar*, 515 U.S. 593, 599 (1995). The CNN Email was not among the categories of documents requested by the grand jury's subpoena. The email contains no classified information, and says nothing about the CIA or its "operations, sources, assets, or methods." *See* JA2851-52. Whatever inferences

may be drawn from a defendant's destroying a document that he knows "to be generally responsive to a grand jury subpoena," *United States v. Quattrone*, 441 F.3d 153, 171 n.19 (2d Cir. 2006), no like inferences flow from a defendant's deleting an email he knows to be *non*-responsive to the grand jury's investigation. *See Aguilar*, 515 at 599 ("[I]f the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct."). *Cf. United States v. McKibbins*, 656 F.3d 707, 712 (7th Cir. 2011) ("The more material the evidence" to the official proceeding, then "the stronger the inference" of a "corrupt *mens rea*" if the defendant conceals that evidence).

5.     At a minimum, Sterling's conviction on the Obstruction Count should be vacated and remanded for resentencing if the Court reverses Sterling's other counts of conviction. *E.g.*, *United States v. Bull*, 145 F.3d 1326, at *4 (4th Cir. May 20, 1998) (upon vacating one count of conviction, remanding remaining counts for resentencing "[t]o ensure that the [vacated] conviction does not taint [defendant's] overall sentence").

At sentencing, the district court suggested that, in its view, the Obstruction Count was different in kind from the other counts of conviction. Indeed, the court explained that the severity of the sentence rested heavily on Sterling's having been convicted for disclosing national-defense information to Risen:

Regardless of the merits of [the] program, there's no question that Merlin was a human asset and that the information in that book put him in a highly compromised position, and that is to me the most serious element of this entire case, and that is, of course, another reason why the Court has to impose a sentence that addresses not just your conduct … but there has to be a clear message sent to other people at the agency or in any other kind of clandestine or sensitive or secret operation of the government that when you take an oath in which you promise that you will not reveal secrets, that if you do knowingly reveal those secrets, there's going to be a price to be paid.

JA2520-21.

The district court sentenced Sterling to forty-two months' imprisonment on all counts, to be served concurrently. JA2522. Looking ahead to a potential remand, the government asked the court to confirm that the same sentence would have been imposed even had Sterling been convicted on only one count. JA2526. The court was altogether equivocal on the point:

The only – yes. They're all the same. I mean, the only count that really is a little bit different is the obstruction count because that's sort of after the fact, but, of course, ironically, that had the highest exposure. …

All the other counts have the same core problem, that is, that Merlin's identity was exposed and there was a clear breach of the obligation to keep things secret.

In terms of the obstruction count, that's an obstruction of justice. That's in some respects, you know, has its own problems. So I'm comfortable in putting on the record that the sentence would have been the same were it a conviction of one count or of all of those counts.

JA2526-27.

Because those comments create a substantial question whether the district court would have imposed the same sentence on the Obstruction Count alone, that

count should be remanded for resentencing if the Court vacates the other counts of conviction. *Cf. United States v. Parral-Dominguez*, 794 F.3d 440, 447 (4th Cir. 2015) (remanding for resentencing where trial court did not make it "abundantly clear" it would have imposed identical sentence absent miscalculation of Guidelines).

## IV. ALTERNATIVELY, THE CASE SHOULD BE REMANDED FOR A NEW TRIAL BECAUSE THE DISTRICT COURT ERRONEOUSLY ADMITTED PREJUDICIAL CHARACTER EVIDENCE

At a minimum, Sterling's convictions should be vacated and the case remanded for a new trial. The district court allowed the government to introduce, over Sterling's objection, extrinsic evidence that Sterling had mishandled CIA materials on other occasions. Those materials had nothing to do with the Program or the crimes charged, and were offered solely to impugn Sterling's character as someone with a propensity to mishandle classified documents in violation of CIA policy. Admission of those documents was exceedingly prejudicial and warrants a new trial.

### A. The District Court Erroneously Allowed The Government To Offer Character Evidence Establishing Sterling's Propensity To Mishandle Classified Material

1. Before trial, the government moved under Fed. R. Evid. 404(b) to introduce, as "similar acts" evidence, the four classified documents that were seized from Sterling's Missouri residence in 2006. JA342-64; *see* JA2724-25;

*GX142-44*.  The government argued that those documents were admissible because, among other things, they were necessary to establish venue for the Retention Count.  JA347, 353.

Sterling objected.  He pointed out that most of these documents were from the Cold War era, had nothing to do with the Program or the charged offenses, and were being offered simply to establish Sterling's propensity to mishandle classified material—precisely what Rule 404(b) forbids.  JA392-406, 443-61, 533-38; *see Dkts. 336, 338*.

The district court admitted all four documents.  JA439-42, 539-43; *see Aug. 30, 2011 CIPA Tr. at 51-56*; *Sept. 28, 2011 CIPA Tr. at 24-35*; *Oct. 13, 2011 CIPA Tr. at 37-42*.  The court would later instruct the jury not to consider those documents in determining Sterling's guilt.  JA2299-300.  But, by that time, the damage had been done.  In its closing arguments, the government wielded those documents as evidence that Sterling had unlawfully retained the Cover Letter, just as he had mishandled those other CIA materials.  The prosecutor reproved: "[W]here did Mr. Sterling keep CIA documents?  At his home."  JA2229-30.  In case the jury missed it the first time, the prosecutor said it twice more: "Four-and-a-half years after he had any access to CIA facilities, where did Mr. Sterling keep CIA documents?  At his home. … *This is a man who keeps CIA documents at his home*."  *Ibid*. (emphasis added).

The district court's ruling is reviewed for abuse of discretion. *United States v. McBride*, 676 F.3d 385, 395 (4th Cir. 2012).

2.      "Rule 404(b) prohibits evidence of other crimes or bad acts to show bad character or propensity to break the law." *United States v. Siegel*, 536 F.3d 306, 317 (4th Cir. 2008) (citing Fed. R. Evid. 404(b)).  It forbids the use of a defendant's prior acts to suggest that the defendant acted "in conformity therewith" in committing the charged offense. *Id*. at 315; *see United States v. Queen*, 132 F.3d 991, 995 (4th Cir. 1997).  To be admissible, evidence of a defendant's prior acts must be (i) relevant to an issue *other than* character;[25] (ii) necessary; and (iii) reliable. *Ibid*.  Further, the evidence's probative value cannot be "substantially outweighed" by its prejudicial impact. *Ibid*.

The documents seized from Sterling's Missouri home fail that standard. "For evidence to be relevant, it must be 'sufficiently related to the charged offense.'" *United States v. McBride*, 676 F.3d 385, 397 (4th Cir. 2012).  The documents here predated the relevant events by a decade or more, and had nothing to do with the Program or the charges against Sterling. *See ibid*. ("The more closely that the prior act is related to the charged conduct in time, pattern, or state of mind, the greater the potential relevance of the prior act.").  One of the

---

[25] Rule 404(b) provides an illustrative list of permissible uses: "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

documents was Sterling's first performance appraisal from his trainee days in 1993—if not for its "Secret" header, a scrapbook-worthy keepsake. JA2724-25. The other three documents listed telephone numbers that Sterling might need while away from the office; those documents were so old that they presupposed use of a rotary telephone. *GX142-44*; *see* JA1828-32, 2264.

None of these documents had anything to do with Iran, nuclear weapons, or any of the national-defense information at issue in this case. None was alleged to have been disclosed to Risen (or anyone else, for that matter). None was alleged to have been retained by Sterling with the *intent* to disclose them to anyone. For all we know, the documents had been sitting in Sterling's filing cabinet since 1993.[26] In short, the documents bore—at most—a "tenuous and remote" relationship to the crimes at issue. *See United States v. Johnson*, 617 F.3d 286, 297 (4th Cir. 2010). In briefing below, the government advanced a smattering of arguments as to why these documents were relevant to something *other than* Sterling's propensity to mishandle classified material. None is persuasive.

3. *Venue*. The government urged that these documents were relevant because they "tend to prove venue for the charged offenses." JA347; *see* JA353 ("[A]bsent Risen's testimony, the possession of the seized classified documents is

---

[26] The government offered no evidence as to where or how these documents were maintained in Sterling's residence, or any other evidence to suggest that Sterling had retained them willfully (rather than accidentally). *E.g.,* JA2017-18.

necessary to establish venue for Counts Three and Five."). There is no question that the government needed help proving venue, but that is beside the point. Necessity is a *separate* prong of Rule 404(b). The threshold question is whether the evidence is probative of an issue other than character; its necessity to proving venue says nothing about that issue. Quite obviously, the government may not evade Rule 404(b) by offering otherwise inadmissible character evidence under the guise of "venue evidence." Accordingly, the question remains whether the documents were relevant to a non-propensity purpose.

4. *Identity*. The government next urged that the four CIA documents were probative of Sterling's "identity as Risen's source." The government claimed that those documents established that Sterling had a *modus operandi*—a "signature," if you will—of secreting classified CIA documents in his home. This argument was related to the government's venue-by-vicinity theory. The argument went like this: Because Sterling had *these* CIA documents, it made it more likely that Sterling also had *another* CIA document (the Cover Letter) at some point. JA347-51. And because Sterling had these documents in his *house*, the argument continued, they establish that Sterling had a *modus operandi* of making off with CIA documents and squirreling them away in whatever house he happened to be occupying. JA348-51; *see* JA329.

That argument is meritless. The so-called "handiwork" exception to Rule 404 is a narrow one, and requires that the prior bad act be so similar to the charged offense, and so distinctive in nature, as to warrant an inference that the same individual committed both acts. *E.g., United States v. Foutz*, 540 F.2d 733, 737 (4th Cir. 1976). There is nothing idiosyncratic about Sterling's having four CIA documents in his residence. In fact, the government's pretrial disclosures revealed that many CIA agents—including some of the government's own witnesses—have taken classified documents home at one point or another. *See* JA639-46; *Dkts. 336, 338*. More fundamentally, though, the government's proffered purpose for this evidence was to support a proposition so general—"Sterling generally keeps items in his home"—as to be useless. If the "handiwork" exception could be defined so broadly, then it would swallow the rule: that a defendant has committed shoplifting could later be used against him in a burglary trial as evidence of his *modus operandi* to "touch" and "remove" things with his "hands" "without permission."

At bottom, the government's argument is that Sterling violated CIA policies once by taking documents home, and therefore he probably did it again. This is "nothing more than the character evidence that Rule 404(b) prohibits." *United States v. Battle*, 774 F.3d 504, 513 (8th Cir. 2014); *see United States v. McBride*, 676 F.3d 385, 397 (4th Cir. 2012).

5.     *Opportunity*.   The government also urged that the documents were admissible to establish Sterling's "opportunity" to commit the charged offenses, because his possession of those documents made it more likely that he likewise possessed *other* classified documents, thereby giving him the "opportunity" to provide the Cover Letter to Risen.  JA342, 427.

That argument too is meritless.  For starters, as explained above, Sterling's possession of those documents made it no more or less likely that he had the "opportunity" to possess the Cover Letter.  The two had virtually nothing to do with one another.  A typical use of "opportunity" evidence is where the defendant is charged with committed a crime of gun violence, and the government offers evidence that the defendant brandished "the same type of gun" on a prior occasion. *See United States v. Moore*, 709 F.3d 287, 295 (4th Cir. 2013).  If, however, "the prior possession was of a *different* gun," then its probative value diminishes "and the likelihood that it is being used to show propensity to possess guns rises considerably."  *Ibid*. (quoting *United States v. Miller*, 673 F.3d 688, 695 (7th Cir. 2012)) (emphasis added).  The fact that Sterling had unrelated CIA materials in his home did not make it more likely that Sterling willfully took the Cover Letter from the CIA's offices and provided it to Risen—at least, not any more likely than a known "drug dealer" is to have committed a narcotics offense, which is "the very

type of evidence that the limitation imposed by Rule 404(b) was designed to exclude." *McBride*, 676 F.3d at 398.

What is more, the fact that Sterling was physically capable of possessing the Cover Letter was never meaningfully in dispute, and the government offered ample evidence—through admissible means—that Sterling (like other CIA agents) had the capability to remove classified materials from the CIA's offices. *E.g.*, JA1529-30. The question was not whether Sterling had the "opportunity" to provide the Cover Letter to Risen; the question was whether he *did*. That four unrelated documents were found in Sterling's residence contributes nothing to that inquiry. *E.g.*, *United States v. Stacy*, 769 F.3d 969, 974 (7th Cir. 2014) ("The court's Rule 403 balancing should take account of the extent to which the non-propensity fact for which the evidence is offered actually is at issue in the case.").

### B.    The Error Was Devastating

Sterling's defense strategy was to engender reasonable doubt by identifying other potential suspects. Sterling's counsel identified for the jury a number of individuals who had relevant knowledge about the Program and an opportunity to communicate with Risen, none of whom was meaningfully investigated by the government—including Sterling's former supervisor, Merlin, and Senate staffers. *E.g.*, JA903-20, 1745-1802, 2233-69. The jury heard evidence that one Senate staffer, whom Sterling had (lawfully) briefed on the Program, had been terminated

for divulging information in violation of Senate rules—which information then made its way into a *New York Times* article co-written by Risen. JA1745-1802, 2243-44. Sterling's telephone and email contact with Risen was explained away as relating to Sterling's litigation against the CIA; after all, Risen had already published one article on that topic. JA2262-64, 2650.

The district court's error crippled Sterling's defense. Although Sterling identified other individuals who might have discussed the Program with Risen, the jury was faced with only one individual—Sterling—whom the government portrayed to have a practice of making off with classified materials and keeping them in his house.[27]

Making matters worse, the government placed "repeated, heavy emphasis" on the classified documents found in Sterling's home. *See United States v. Madden*, 38 F.3d 747, 754 (4th Cir. 1994). Three of the documents—the ones with 1987-vintage telephone numbers—were admitted under the so-called "silent witness" rule,[28] because the government refused to declassify or redact them for trial (as they had with the scores of other government exhibits). As a result, those

---

[27] The jury would *not* hear that some of the government's own witnesses had likewise violated CIA policies by taking classified materials home. The district court ruled before trial that Sterling's counsel could not impeach certain government witnesses based on their mishandling of classified documents. JA647; *see* JA639-46; *Dkts. 336, 338; Nov. 20, 2014 CIPA Tr*.

[28] *See United States v. Zettl*, 835 F.2d 1059, 1063 (4th Cir. 1987) (describing "silent witness" procedure).

three documents were the only ones in the entire case—a case involving covert CIA missions, nuclear weapons, and a Russian spy, mind you—cloaked in red cover sheets, marked "**SECRET**," and which could not be shown or discussed in open court. *See* JA2292. The jury was instructed that it could not communicate the contents of those exhibits (and only those exhibits) to anyone after the trial was over. *Ibid.*; *see* JA2094-98.

Further, the government called one CIA witness, Martha Lutz, precisely so that she could testify to the importance of classification levels, the potential "serious damage to national security" implied by a "Secret" classification, and to underscore that the four documents found in Sterling's home had been properly classified as "Secret." JA1815-34; *see Jan. 5, 2014 CIPA Tr. at 47-52.* Then, to cap things off, the government's summation made no fewer than three references to those four documents as evidence that Sterling is someone who "keeps CIA documents at his home." JA2229-30; *see Madden*, 38 F.3d at 753 (government's "repeated, clear references" to improperly admitted Rule 404(b) material "creates [] reversible harm").[29]

---

[29] The district court's subsequent limiting instruction did not cure the error. "The meager protection afforded" by a limiting instruction "cannot outweigh the prejudice incurred by evidence that does not meet the mandate of the rule in the first instance." *United States v. Johnson*, 617 F.3d 286, 297 (4th Cir. 2010). Where, as here, the court has admitted prejudicial character evidence in violation

Despite it all, this was a close case. In its third day of deliberations, the jury remained deadlocked on several counts. JA2386-87. Errors under Rule 404(b) require vacatur unless it is "highly probable that the error did not affect the judgment." *Madden*, 38 F.3d at 753; *see McBride*, 676 F.3d at 398. Because the government cannot carry its burden of showing that its improper character evidence "did not have a substantial and injurious effect or influence on the verdict," *Johnson*, 617 F.3d at 299, Sterling's convictions should be vacated and the case remanded for a new trial.[30]

## CONCLUSION

The judgment of conviction should be reversed. Alternatively, the Court should vacate all counts of conviction and remand for a new trial.

## REQUEST FOR ORAL ARGUMENT

Sterling respectfully requests oral argument. This is a complex case that poses significant legal questions concerning the Constitution's venue requirement

---

of Rule 404(b), even an "exemplary limiting instruction" cannot paper over that error. *United States v. Hernandez*, 975 F.2d 1035, 1039 (4th Cir. 1992).

[30] Because the government's evidence on the Risen Counts, Attempt Counts, Retention Count, and Book Counts might well have "arouse[d] the jury into convicting" Sterling on the Obstruction Count, and much (if not all) of that evidence would have been inadmissible in an obstruction-only prosecution, the spillover prejudice from the district court's error warrants reversal of the Obstruction Count as well. *E.g., United States v. Rooney*, 37 F.3d 847, 855 (2d Cir. 1994).

and the Federal Rules of Evidence. Sterling believes oral argument will be of assistance to the Court.

Dated: February 12, 2016        Respectfully submitted,

/s/ William J. Trunk
Lawrence S. Robbins
William J. Trunk
ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER, LLP
1801 K Street, N.W, Suite 411L
Washington, D.C. 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
wtrunk@robbinsrussell.com

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 13,539 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).


/s/ William J. Trunk_____
William J. Trunk

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 12, 2016, I filed three copies of the foregoing brief with the CISO. I filed the Joint Appendix using the appellate CM/ECF system, which will send notice of such filing to counsel for all parties. In addition, I caused one paper copy of the Joint Appendix to be sent via Federal Express to the Clerk of Court's office.

/s/ William J. Trunk
William J. Trunk