No. 15-4297

# United States Court of Appeals
## For the Fourth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

JEFFREY ALEXANDER STERLING,

*Defendant-Appellant*.

On Appeal From The United States District Court
For The Eastern District of Virginia (Brinkema, J.)

**BRIEF FOR THE UNITED STATES**

DANA J. BOENTE
United States Attorney

JAMES L. TRUMP
DENNIS M. FITZPATRICK
United States Attorney's Office
Eastern District of Virginia

ERIC G. OLSHAN
Criminal Division, Public
  Integrity Section
U.S. Department of Justice

LESLIE R. CALDWELL
Assistant Attorney General

SUNG-HEE SUH
Deputy Assistant Attorney General

ROBERT A. PARKER
Criminal Division, Appellate Section
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-3521

## TABLE OF CONTENTS

STATEMENT OF JURISDICTION.................................................. 1

STATEMENT OF ISSUES......................................................... 1

INTRODUCTION ............................................................... 2

STATEMENT OF THE CASE ...................................................... 3

    A. Procedural History .......................................... 3

    B. Statement Of Facts ........................................... 3

        1. *Classified Program No.1*............................... 3

        2. *Sterling's Relationship With The CIA Sours And He Is Fired*............................................. 6

        3. *Sterling Starts Feeding Information To Risen* .............. 7

        4. *Sterling Threatens To Tell The Press About Classified Program No.1*............................... 8

        5. *Sterling Leaks Classified Information To Risen* ........... 10

        6. *Sterling Remains In Frequent Contact With Risen* ........ 12

        7. *State of War*......................................... 13

        8. *Aftermath* .......................................... 15

    C. Rulings Under Review...................................... 16

SUMMARY OF ARGUMENT .................................................... 17

ARGUMENT ....................................................................................... 20

I.      THERE WAS SUFFICIENT EVIDENCE OF VENUE ................... 20

        A. Standard Of Review ....................................................... 20

        B. Legal Principles .............................................................. 21

        C. The Jury's Findings Of Venue On Each Count Were
           Supported By Sufficient Evidence ................................. 23

                1. *Count 3* ............................................................... 23

                2. *Counts 4 and 5* .................................................. 26

                3. *Counts 6 and 7* .................................................. 30

                4. *Counts 1, 2, and 9* ............................................. 32

II.     THE DISTRICT COURT'S VENUE INSTRUCTION WAS
        CORRECT ........................................................................... 36

        A. Standard Of Review ....................................................... 36

        B. Background ..................................................................... 36

        C. The Venue Instruction Was Accurate ............................. 37

        D. Any Error Was Harmless ............................................... 41

III.    THE EVIDENCE WAS SUFFICIENT TO SHOW THAT
        STERLING OBSTRUCTED JUSTICE ................................. 43

        A. Standard Of Review ....................................................... 43

        B. Background ..................................................................... 43

C. The Jury Had Sufficient Evidence To Find That Sterling
Deleted The Email With Intent To Obstruct The Grand
Jury's Investigation........................................................................ 44

IV.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION
IN ADMITTING EVIDENCE THAT STERLING KEPT
CLASSIFIED DOCUMENTS AT HIS HOME ................................. 51

A. Standard Of Review ...................................................................... 51

B. Background ................................................................................... 51

C. The District Court's Evidentiary Ruling Was Not An
Abuse Of Discretion ...................................................................... 54

1. *Rules 404(b) and 403* ................................................................. 54

2. *The Evidence Was Properly Admitted Under Rule 404(b)* .................. 55

3. *The Evidence Was Properly Admitted Under Rule 403* ...................... 60

D. Any Error Would Have Been Harmless ......................................... 62

CONCLUSION ......................................................................................... 63

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*Arthur Andersen LLP v. United States*,
    544 U.S. 696 (2005) ................................................................ 46

*Huddleston v. United States*,
    485 U.S. 681 (1988) ...........................................................56, 59

*Musacchio v. United States*,
    136 S. Ct. 709 (2016) ............................................................. 21

*Pashby v. Delia*,
    709 F.3d 307 (4th Cir. 2013) ................................................. 39

*Reass v. United States*,
    99 F.2d 752 (4th Cir. 1938) ................................................... 38

*Salinger v. Loisel*,
    265 U.S. 224 (1924) ............................................................... 33

*Sterling v. Tenet*,
    416 F.3d 338 (4th Cir. 2005) ................................................... 9

*United States v. Aguilar*,
    515 U.S. 593 (1995) ............................................................... 47

*United States v. Ashley*,
    606 F.3d 135 (4th Cir. 2010) ................................................. 25

*United States v. Basham*,
    561 F.3d 302 (4th Cir. 2009) ................................................. 54

*United States v. Binday*,
    804 F.3d 558 (2d Cir. 2015) ................................................. 48

*United States v. Blecker,*
657 F.2d 629 (4th Cir. 1981) ................................................................ 34

*United States v. Bowens,*
224 F.3d 302 (4th Cir. 2000) .............................................. 22, 37, 38

*United States v. Brooks,*
111 F.3d 365 (4th Cir. 1997) .................................................. 46, 47

*United States v. Burns,*
990 F.2d 1426 (4th Cir. 1993) ............................................ 20, 21, 22

*United States v. Byers,*
649 F.3d 197 (4th Cir. 2011) ........................................ *passim*

*United States v. Cabrales,*
524 U.S. 1 (1998) ...................................................................... 28

*United States v. Calandra,*
414 U.S. 338 (1974) ................................................................ 48

*United States v. Crachy,*
800 F.2d 83 (6th Cir. 1986) ............................................... 59

*United States v. Ebersole,*
411 F.3d 517 (4th Cir. 2005) ........................................ *passim*

*United States v. Engle,*
676 F.3d 405 (4th Cir. 2012) ................................ 20, 23, 28, 38

*United States v. Evans,*
318 F.3d 1011 (10th Cir. 2003) ............................................. 26

*United States v. Foutz,*
540 F.2d 733 (4th Cir. 1976) ............................................... 60

*United States v. Foy,*
641 F.3d 455 (10th Cir. 2011) .............................................. 34

*United States v. Frankhauser,*
  80 F.3d 641 (1st Cir. 1996) ...................................................... 48

*United States v. Friske,*
  640 F.3d 1288 (11th Cir. 2011) .............................................. 49

*United States v. Georgacarakos,*
  988 F.2d 1289 (1st Cir. 1993) .................................................. 41

*United States v. Gravely,*
  840 F.2d 1156 (4th Cir. 1988) ................................................ 48

*United States v. Gray,*
  137 F.3d 765 (4th Cir. 1998) (en banc) ........................... 25, 44, 46

*United States v. Hankish,*
  502 F.2d 71 (4th Cir. 1974) ..................................................... 28

*United States v. Jefferson,*
  674 F.3d 332 (4th Cir. 2012) ..............................................20, 40

*United States v. Jernigan,*
  341 F.3d 1273 (11th Cir. 2003) .............................................. 59

*United States v. Johnson,*
  323 U.S. 273 (1944) ................................................................. 38

*United States v. Johnson,*
  510 F.3d 521 (4th Cir. 2007) ........................................ 33, 34, 35

*United States v. Johnson,*
  617 F.3d 286 (4th Cir. 2010) ..............................................56, 59

*United States v. Johnson,*
  655 F.3d 594 (7th Cir. 2011) ................................................. 48

*United States v. Leong,*
  536 F.2d 993 (2d Cir. 1976) ................................................... 25

*United States v. Lombardo,*
241 U.S. 73 (1916) ................................................................ 34

*United States v. Manigan,*
592 F.3d 621 (4th Cir. 2010) ................................................ 20

*United States v. McBride,*
676 F.3d 385 (4th Cir. 2012) ................................................ 59

*United States v. McLaurin,*
764 F.3d 372 (4th Cir. 2014) ................................................ 36

*United States v. Moore,*
709 F.3d 287 (4th Cir. 2013) ................................................ 59

*United States v. Newsom,*
9 F.3d 337 (4th Cir. 1993) ...................................................... 20

*United States v. Osborne,*
514 F.3d 377 (4th Cir. 2008) ...................................... 25, 46, 57

*United States v. Penniegraft,*
641 F.3d 566 (4th Cir. 2011) ...................................... 43, 56, 59

*United States v. Petruk,*
781 F.3d 438 (8th Cir. 2015) ................................................ 49

*United States v. Pratt,*
351 F.3d 131 (4th Cir. 2003) ............................................ 30, 31

*United States v. Quattrone,*
441 F.3d 153 (2d Cir. 2006) ................................................ 49

*United States v. Queen,*
132 F.3d 991 (4th Cir. 1997) ......................................... *passim*

*United States v. Quinn,*
359 F.3d 666 (4th Cir. 2004) ................................................ 42

*United States v. Ramirez*,
  420 F.3d 134 (2d Cir. 2005) ..................................................... 40

*United States v. Reigle*,
  228 F. App'x 353 (4th Cir. 2007) ............................................ 35

*United States v. Resendiz-Ponce*,
  549 U.S. 102 (2007) .............................................................30, 32

*United States v. Rodriguez*,
  587 F.3d 573 (2d Cir. 2009) ..................................................... 28

*United States v. Rodriguez-Moreno*,
  526 U.S. 275 (1999) .............................................................21, 22

*United States v. Rowe*,
  414 F.3d 271 (2d Cir. 2005) ..................................................... 35

*United States v. Royer*,
  549 F.3d 886 (2d Cir. 2008) .................................................34, 35

*United States v. Siegel*,
  536 F.3d 306 (4th Cir. 2008) ........................................54, 55, 61

*United States v. Simpson*,
  741 F.3d 539 (5th Cir. 2014) ..................................................... 49

*United States v. Smith*,
  452 F.3d 323 (4th Cir. 2006) .......................................22, 32, 34

*United States v. Smith*,
  62 F.3d 641 (4th Cir. 1995) ..................................................... 42

*United States v. Sterling*,
  724 F.3d 482 (4th Cir. 2013) ..................................................... 3

*United States v. Stewart*,
  256 F.3d 231 (4th Cir. 2001) .................................................34, 41

*United States v. Strain*,
  396 F.3d 689 (5th Cir. 2005) ................................................... 41

*United States v. Varner*,
  748 F.2d 925 (4th Cir. 1984) .................................................. 42

*United States v. Walker*,
  677 F.2d 1014 (4th Cir. 1982) ................................................ 42

*United States v. White*,
  810 F.3d 212 (4th Cir. 2016) .............................................41, 62

*United States v. Whorley*,
  550 F.3d 326 (4th Cir. 2008) .................................................. 59

*United States v. Zayyad*,
  741 F.3d 452 (4th Cir. 2014) ................................................. 25

*Weeks v. Angelone*,
  528 U.S. 225 (2000) ..................................................39, 40, 62

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. III, § 2, cl. 3 ....................................................... 21

U.S. Const. amend. VI ............................................................... 21

## STATUTES AND RULES

18 U.S.C. 641 ........................................................................ 3, 32

18 U.S.C. 793 ........................................................................ *passim*

18 U.S.C. 1341 ......................................................................... 26

18 U.S.C. 1343 .....................................................................26, 40

18 U.S.C. 1512 ...................................................................3, 46, 49

18 U.S.C. 3231 ................................................................... 1

18 U.S.C. 3237 ........................................................ 18, 22, 27, 38

28 U.S.C. 1291 ................................................................... 1

Intelligence Community Whistleblower Protection Act of 1998,
    Pub. L. No. 105-272, tit. VII, 112 Stat. 2396 ............................... 9

Fed. R. Crim. P. 18 ............................................................ 21

Fed. R. Evid. 401 ............................................................... 54

Fed. R. Evid. 403 ............................................................ 55, 60

Fed. R. Evid. 404(b) ........................................................*passim*

## OTHER AUTHORITIES

Webster's Third New International Dictionary (1971) ................................. 27

## STATEMENT OF JURISDICTION

Defendant Jeffrey Sterling filed a timely notice of appeal on May 26, 2015.  JA2530.[1]  The district court had jurisdiction pursuant to 18 U.S.C. 3231, and this Court has jurisdiction under 28 U.S.C. 1291.

## STATEMENT OF ISSUES

1.      Whether evidence of venue was sufficient on the non-obstruction counts.

2.      Whether the district court's venue instruction was correct.

3.      Whether Sterling's obstruction conviction was supported by sufficient evidence.

4.      Whether the district court abused its discretion in admitting evidence under Federal Rule of Evidence 404(b).

---

[1] Record citations are to the Joint Appendix ("JA") and classified documents cited by docket or exhibit number.  References to the defendant's brief are captioned "Br."

## INTRODUCTION

Jeffrey Sterling is a former CIA case officer who was fired for poor performance. Failing to obtain redress through legal means, he resorted to illegal ones: he disclosed classified information about a CIA nuclear counterproliferation program to James Risen, a reporter for *The New York Times*. Much of the information Sterling disclosed was true, but he falsified key details to make the program look like a failure (it was not); to make his CIA colleagues appear reckless (they were not); and to make himself look like a hero (he was not). Sterling hoped Risen would believe and publish his lies, discrediting the CIA in the process. And that is precisely what happened. Sterling's actions destroyed the program, endangered the lives of a covert human asset and his family, and compromised the United States' ability to prevent the spread of nuclear weapons.

The jury found that Sterling did all these things, and he does not dispute that on appeal. Instead, he argues that the evidence and jury instructions were insufficient to establish *where* he committed his crimes; that there was insufficient proof that he tried to cover up his crimes by destroying evidence; and that one of the district court's evidentiary rulings was erroneous. None of these arguments is supported by the record or the law. Sterling's convictions should be affirmed.

# STATEMENT OF THE CASE

## A.    Procedural History

A jury in the Eastern District of Virginia convicted Sterling of six counts of unlawful disclosure of national defense information, in violation of 18 U.S.C. 793(d) and (e); one count of unlawful retention of national defense information, in violation of 18 U.S.C. 793(e); one count of unauthorized conveyance of government property, in violation of 18 U.S.C. 641; and one count of obstruction of justice, in violation of 18 U.S.C. 1512(c)(1).  JA2492. The district court sentenced Sterling to concurrent terms of 42 months in prison, to be followed by two years of supervised release.  JA2493-94.[2]

## B.    Statement Of Facts

### 1.    *Classified Program No. 1*

In 1996, the CIA developed a program ("Classified Program No. 1") to disrupt Iran's pursuit of a nuclear weapon.  JA950-53, 2533-34.  The CIA recruited a former Soviet nuclear weapons expert known as "Merlin" to pose as a disgruntled scientist willing to sell Iran a schematic for a Russian fire set, one of the components needed to build a nuclear bomb.  JA924-27, 951, 1052-

---

[2]  The government filed an interlocutory appeal prior to trial, challenging three district court rulings suppressing evidence.  This Court reversed those rulings and remanded the case for trial.  *United States v. Sterling*, 724 F.3d 482 (4th Cir. 2013).

53, 2533-36.  The schematic looked genuine, but it was not:  experts at a U.S. National Laboratory spent years creating and testing hidden electrical flaws in the design to "ensure that it would not function."  JA1050, 1057-64, 2535-41. The flaws were designed to look like mistakes, not sabotage, and were "nested" so that as some were solved, others would appear, leading the Iranians into an endless maze.  JA1061-62, 2537-41; *see* JA1059 (flaws "were so many and so complex that . . . it would have been impossible" to fix them all).  The Iranians would likely waste years of effort before realizing the design was worthless, setting back their nuclear program and discrediting Russian technology in their eyes.  JA1116-18, 2535-36, 2540, 2552, 2581.

Sterling joined the program in 1998 and served as Merlin's case officer until May 2000, working out of the CIA's New York office.  JA977-78, 1127-28, 1217-18, 1524-28, 2608-09.  In November 1998, Sterling and other CIA officers met Merlin in San Francisco and showed him the fire-set design. JA979, 1131-34, 2546-47, 2909-11.  Merlin noted that it was missing several "major subcomponents," which the CIA confirmed was intentional:  the plan was for Merlin to give the Iranians an incomplete schematic and offer to fill in the blanks for money.  JA983, 1134-37, 1149, 2546-51, 2911-12.  The missing parts Merlin identified were *not* the hidden electrical flaws; indeed, the CIA withheld details of those flaws from Merlin in case the Iranians interrogated

him.  JA952-53, 1111-12, 1124-25, 1136-37.  Merlin was comfortable with this approach and with his mission, and Sterling—who was aware of everything the National Laboratory did—expressed no concerns.  JA1000-01, 1128-29, 1147-49, 1364, 2547, 2550, 2924, 2928-31.

Eventually, the agency decided that Merlin should approach an official at Iran's mission to the International Atomic Energy Agency ("IAEA") in Vienna, Austria, to deliver the plans.  JA1159-60, 2552-53.  For over a year, Sterling and his supervisor on the project, Robert S., worked with Merlin to plan this operation in meticulous detail.  *See* JA1159-1204, 2552-76, 2579-80, 2583-2601.  In February 2000, Sterling and Mr. S. concluded that Merlin was fully prepared and sent him to Vienna.  JA1200-04, 2601, 2915.  The operation went according to plan in nearly every respect:  after arriving safely in Vienna, Merlin printed out a letter to the Iranians (which the CIA had edited and approved, *see* JA1184-86, 1195-98, 2586, 2591, 2594-97, 2915-17) identifying the schematic as a free but incomplete design for a Russian fire set and requesting payment for the rest; he sealed the letter and schematic in an envelope addressed to the Iranian official; and he delivered the package to the IAEA mission's mailbox.  *See* JA2602-03, 2915-23.  The Iranians took the bait and sent the package back to Iran.  JA1216, 2606.

5

The CIA considered the operation a complete success. *See* JA2553, 2606. Merlin hailed it as "brilliant." JA2930. Sterling was "pleased" with how the program unfolded and expressed no concerns whatsoever. *See* JA1152-53, 1164, 1177, 1183, 1192-93, 1204, 1214, 1528, 1640, 2927.

### 2. *Sterling's Relationship With The CIA Sours And He Is Fired*

In May 2000, a few days before his assignment with Classified Program No. 1 ended, Sterling filed an equal employment opportunity ("EEO") complaint with the CIA alleging that he had been denied better assignments because he was an African American. JA2732-36, 2744-45.[3] Sterling refused the CIA's offer to find him another suitable job in the agency, saying he had developed a "distaste" for the CIA and wanted a severance package worth hundreds of thousands of dollars instead. JA1559-60, 2666, 2742-43. Sterling admitted that he intended to keep working "only long enough to pursue his claim," which he vowed to do "as long and as loud as possible inside and outside the agency." JA2666.

In August 2000, Sterling moved from New York to Herndon, Virginia, to take a position at CIA headquarters. JA1987, 2760. He refused, however, to accept any assignments in his new job and eventually stopped showing up

---

[3] The EEO record refers to Sterling as "Samuel Crawford." JA1484-85.

for work. JA2760. In May 2001, the CIA's EEO office deemed Sterling's discrimination claims meritless and the Personnel Evaluation Board recommended that he be fired. JA2760-73. Sterling responded by filing a federal discrimination suit against the agency. JA2774-79. At no point, however, did Sterling raise any concerns about Classified Program No. 1. JA1561, 1644, 1670-71.

The CIA "outprocessed" Sterling on October 31, 2001 (at which point his regular employment ended), and he was officially terminated on January 31, 2002. JA2782-86. During his termination interview, the agency informed Sterling (as it had many times during his employment) that he was prohibited from divulging classified information or retaining classified material, and that doing so could be a crime. JA1941-47, 2714-16. The agency also explicitly asked Sterling "if he had any materials he needed to return." JA1943. Sterling refused to answer or to sign a form acknowledging his continuing legal obligations. JA1943-48, 2714-16.

### 3. *Sterling Starts Feeding Information To Risen*

Five days after Sterling was outprocessed from the CIA, Risen published an article in *The New York Times* entitled, "Secret C.I.A. Site in New York Was Destroyed on Sept. 11." JA2647-49. The article stated that an "undercover" CIA facility was located in one of the World Trade Center buildings destroyed

in the September 11 terrorist attacks and cited an anonymous "former agency official" as a source.  *Id.*  The location of the New York office (where Sterling previously worked) was classified.   JA1383.   Two months later, Sterling "boast[ed]" to a colleague that "he had confirmed" to a "newspaper" the "location of . . . the New York City CIA Office that had been destroyed in the September 11 event."  JA1573.

On March 2, 2002, Risen published an article in *The New York Times* about Sterling's discrimination suit entitled, "Fired by C.I.A., He Says Agency Practiced Bias."   JA2650-51.   The article quoted from Sterling's CIA performance evaluations and said, among other things, that Sterling "relished" his role in a "secret assignment to recruit Iranians as spies."  *Id.*

### 4.    *Sterling Threatens To Tell The Press About Classified Program No. 1*

Sterling's relationship with the CIA deteriorated further in early 2003. On January 7, Sterling contacted the CIA's Publications Review Board to express his "extreme unhappiness" with the Board's requests that he remove classified information from his draft memoirs.  JA2687.  Sterling said he was "'absolutely disgusted'" with the CIA and planned to "com[e] 'at [the agency] with everything at his disposal.'"   JA1603-04, 2687.   A month later, the

agency declined Sterling's offer to settle his discrimination suit for hundreds of thousands of dollars. JA2797-99.[4]

On March 4, 2003, Sterling filed a second lawsuit against the CIA, alleging wrongful interference with his memoirs. JA2688-92. The next day, Sterling met with two staff members of the Senate Select Committee on Intelligence, Donald Stone and Vicki Divoll, and told them—three years after his involvement with the operation ended—that he had concerns about Classified Program No. 1. JA1685-86, 1755-58, 2718-19.[5] Sterling claimed (without providing details or evidence) that the CIA had given Iran a functional fire-set design with flaws so obvious that Merlin "recognized [them] almost immediately." *Id.* Sterling wanted the Committee to "take action" against the CIA, and warned Stone and Divoll that if they did not act "soon," he would "do something else." JA1691, 1759. Stone understood that to mean "going to the press." JA1691. A committee staff member investigated Sterling's claims and concluded they were meritless. JA1695, 1808.

---

[4] Sterling's lawsuit was eventually dismissed. JA2823-24, 2841; *see Sterling v. Tenet*, 416 F.3d 338 (4th Cir. 2005).

[5] CIA employees may raise concerns about classified matters with the House and Senate intelligence committees or the CIA's Inspector General. *See* Intelligence Community Whistleblower Protection Act of 1998, Pub. L. No. 105-272, tit. VII, 112 Stat. 2396, 2413-2417. Sterling discussed his discrimination claims with the House Committee in 2000, but he never raised any concerns about Classified Program No. 1. JA1670-72.

## 5. *Sterling Leaks Classified Information To Risen*

On February 24, 2003, Sterling's attorneys advised the CIA that an "unnamed client" (later identified as Sterling) had expressed "concerns about an operation that was nuclear in nature" and "threatened to go to the media." JA2060. Three days later—and a year after their last known contact—Sterling placed a telephone call from his home in Herndon, Virginia to Risen's home in Maryland. JA2801; *see* JA1987, 1997-99, 2726, 2858. Sterling called Risen six more times between March 10 and 29, again using his home telephone. JA2801-02. Sterling also sent Risen an email on March 10 attaching an article from CNN's website entitled, "Report: Iran has 'extremely advanced' nuclear program," and asking, "quite interesting, don't you think? All the more reason to wonder . . . ." JA1960-62, 2801, 2815-22.

On April 3, 2003, Risen telephoned William Harlow, the CIA's Director of Public Affairs, and told Harlow that he had learned about Classified Program No. 1 and intended to write a story about the operation. JA1403-04, 2652. Risen described the program to Harlow in detail but admitted that he did not know if it continued beyond 2000, the last year Sterling was involved. *Id.* In a subsequent conversation, Risen said he "had been told" that the operation was "'not handled properly'" because "the Iranians had already been told that the designs the[y] were given were flawed" and would have been

10

capable of fixing any errors. JA1414-15, 2655. Risen read parts of his draft story to Harlow and confirmed that he obtained his information from documents and "knowledgeable people." *Id.*

Risen's revelation alarmed senior officials. On April 30, 2003, after conferring with President Bush, National Security Advisor Condoleezza Rice and Director of Central Intelligence George Tenet met with Risen and Jill Abramson, the Washington Bureau Chief of *The New York Times*. JA1417-21, 1439-53, 2656-58. Dr. Rice explained that Classified Program No. 1 was "one of the most sensitive and important" programs in the United States government and that allegations "that the program was mismanaged and already revealed to the Iranian government" were "totally false." JA2657, 1447-49. Risen implied that "he had seen a letter to the Iranians from the Russian which had told them that the program was flawed," but Director Tenet explained that Risen misunderstood the purpose of the letter. JA1420, 2656. Dr. Rice and Director Tenet stated that Risen's proposed article would compromise national security and place Merlin in grave danger, and they urged the *Times* not to publish it. JA1419-20, 1449-53, 2656-57. The *Times* agreed. JA1421, 1453, 2659.

### 6. *Sterling Remains In Frequent Contact With Risen*

In August 2003, Sterling moved from Virginia to Missouri. JA1987-88, 2870. In the ensuing year, there were 24 telephone calls between Risen's home or office and Sterling's home or office. JA1999-2002, 2803-10, 2858-59, 2870.

A forensic analysis of the computer Sterling used during this time revealed 13 deleted emails between Sterling and Risen. JA1207-21, 2803-09; *see* JA2728, 2871. The contents of some emails were irretrievable, but others revealed that Sterling and Risen had been meeting and exchanging information. For example, a December 23, 2003 email from Risen to Sterling asked, "can we get together in early january?" JA2803. On May 8, 2004, Risen told Sterling, "I want to call today. I'm trying to write the story . . . I need your phone number again." JA2806. On May 16, 2004, Risen sent Sterling an email stating, "I am sorry if I have failed you so far. But I really enjoy talking with you, and I would like to continue." JA2807. Risen also apparently sent documents to Sterling for review. A June 10, 2004, email from Risen to Sterling said, "I can get it to you. Where can I send it?" JA2808. The next day, Risen sent a package using Federal Express and called or emailed Sterling five times. JA1982-83, 2825, 2856, 2808.

Sterling moved to another home in Missouri in August 2004. JA1988. From then to November 2005, there were 16 telephone calls between Sterling's

cell phone or work phone and *The New York Times* or Risen's personal telephone number.  JA2002-03, 2726-27, 2810-14, 2860.

In September 2004, Risen sent his publisher a proposal for an "Untitled CIA Book" containing information about Classified Program No. 1, which Risen said he obtained from one or more "CIA officers involved in the operation."  JA2012-15, 2828-32, 2864.  Among other things, the proposal included Merlin's true first name—a fact known only to a few people at the CIA (including Sterling) and one of the "single most important" secrets held by the agency.  JA1222-23, 1544, 1826-27, 2013-14, 2832.

The last telephone call between Sterling and Risen occurred on November 20, 2005.  JA2814.  In December, Risen published a book called *State of War: The Secret History of the CIA and the Bush Administration*, which describes Classified Program No. 1 in detail.  JA2613-39, 2864.  Risen and Sterling had no known contact after the book was published.  JA2004, 2814.

### 7.    *State of War*

Chapter 9 of *State of War*, entitled "A Rogue Operation," reveals many true facts about Merlin and Classified Program No. 1.  JA2613-39.  But key details of the story are false.  *See* JA490-507 (Robert S. testimony, describing false statements); JA2927-37 (Merlin testimony, same)

Risen claims, for example, that the flaws in the fire-set design *were* the missing subcomponents Merlin identified at the San Francisco meeting—the same false story Sterling told the Senate Intelligence Committee in 2003. JA2624-25, 2632. Risen also reprints Merlin's cover letter to the Iranian IAEA official (which Sterling and others at the CIA spent months crafting), but portrays it as something Merlin wrote at the last minute in an effort to undermine the operation and possibly double-cross the CIA. JA2625-26. As Risen tells it, Merlin was a venal bumbler who was "suspicious of the CIA's motives" and thought the mission was "crazy," while Robert S. was indifferent to the dangers and thought "[i]t was all a game." JA2616-19. In contrast, Merlin's "case officer" (Sterling) is portrayed as conscientious and deeply concerned about the program, concerns his superiors ignored. JA2618, 2624-25, 2632. Risen concludes—consistent with Sterling's claims, but contrary to the evidence introduced at trial—that Classified Program No. 1 helped Iran's nuclear program and was "one of the most reckless operations in the modern history of the CIA." JA2628.

Several other features of Chapter 9 point to Sterling as Risen's source. The detailed portion of Risen's narrative begins with the San Francisco meeting in 1998 and ends with the Vienna mission in 2000, which corresponds to the beginning and end of Sterling's tenure. *See* JA2624-28. Risen admits to

not knowing whether the program continued after the Vienna operation, when Sterling left. JA2632. The version of Merlin's letter quoted in the book is the final version, which Merlin gave to Sterling (and only Sterling) before leaving for Vienna; it contains Sterling's last-minute edits, which are not contained in any other draft. JA1195-97, 2594-97, 2625-26. The chapter quotes language from one of Sterling's performance evaluations discussing an unnamed asset and links it to Merlin, which the document itself does not do. JA2618, 2644-45. The chapter also contains details of two events—a trip to Sonoma County after the San Francisco meeting (JA2619) and the fact that Merlin followed a postman into the Iranian IAEA mission (JA2627)—that do not appear in any cables or documents and were known only to Sterling and a few other people. JA1138-39, 1143, 1212-13, 2619, 2627.

### 8. *Aftermath*

The fallout from Risen's book was severe. In the years following the Vienna mission, the CIA worked with Merlin on other projects, including targeting other nuclear programs using the same methods. JA1222-23, 2925-27. The disclosure of information about Classified Program No. 1 brought these efforts to a crashing halt. JA1223-25, 1469-70, 2722-23. Iran and other targets learned about the ruse, enabling them to take countermeasures against U.S. efforts to combat nuclear proliferation. JA1226-27, 1531-33, 1647-50,

2722-23. Russia discovered the extent of U.S. knowledge about its nuclear weapons technology. JA1227-28, 1648-49, 2722. Most importantly, the Russians and Iranians were able to connect Merlin to the CIA, eliminating his usefulness as U.S. asset and putting his life and the lives of his family in danger—which continues to this day. JA1039, 1224, 1228-29, 1473, 1826-27, 2073-75, 2663-64, 2938.

## C.    Rulings Under Review

Sterling appeals from his judgment of conviction. JA2492-96. Specifically, he challenges the denial of his motion for acquittal; the district court's instruction on venue; and the admission of evidence under Federal Rule of Evidence 404(b).

## SUMMARY OF ARGUMENT

1.    The jury found, beyond a reasonable doubt, that Sterling retained classified material after he was fired by the CIA, disclosed that material and other classified information to Risen in an effort to discredit the agency, and caused Risen and others to disclose the information to the general public, all in violation of federal law.  Sterling does not challenge those findings.

Instead, Sterling argues that the jury lacked sufficient evidence to find by a preponderance of the evidence that at least some of his criminal conduct occurred in the Eastern District of Virginia.  He repeatedly notes the lack of direct evidence, which is true:  Sterling destroyed much of it, and Risen steadfastly refused to testify about the identity of his source or the circumstances in which he received information about Classified Program No. 1 despite this Court's earlier ruling that he had no legal ground for refusing. *See* JA2868.  But Sterling minimizes the significant circumstantial evidence from which the jury could, and did, find venue.  Sterling lived and worked in the Eastern District and continued to live there throughout the critical period between his firing and his disclosure of information to Risen.  Sterling placed telephone calls and sent email to Risen from that district in the weeks leading up to Risen's admission to the CIA (also in the district) that he had received information about the program, including a copy of Merlin's letter to the

Iranians. Risen later disclosed the information Sterling provided in *State of War*, which was distributed widely in the district. This circumstantial proof was entitled to the same weight as direct evidence, and the jury was entitled to draw reasonable inferences from it. Particularly under a preponderance standard—and given that Sterling was subject to prosecution in any district where the disclosure of classified information began, continued, or ended, 18 U.S.C. 3237(a)—a rational jury could easily have found facts justifying his trial in the Eastern District.

2. The district court's instruction on venue was correct. This Court has previously approved the same instruction for cases involving continuing offenses, which includes Sterling's crimes. The instruction was fully consistent with the principle that essential criminal conduct must occur in the district and did not permit the jury to convict based on mere "preparatory acts." Indeed, the district court also instructed the jury that it had to find that Sterling's "offense was committed" in the district, JA2319, and it provided a supplemental instruction clarifying that the jury had to find that the conduct charged in the indictment occurred in the district, JA2372.

3. There was ample evidence that Sterling obstructed justice. Sterling preserved his March 10, 2003 email to Risen—forwarding an article about Iran's "'extremely advanced' nuclear program" and asking, "quite interesting,

don't you think? All the more reason to wonder . . . ," JA2815-22—in his email account for years until it suddenly disappeared between April and July 2006. That is precisely when Sterling received a grand jury subpoena and target letter informing him that he was being investigated for disclosing classified information. The evidence showed that the email was responsive to the grand jury subpoena, that it was highly inculpatory, and that Sterling deleted it in order to prevent its discovery in the course of the grand jury's investigation. The jury was not required to find that the deletion of the email was an unfortunate coincidence, as Sterling claims.

4. The district court did not abuse its discretion in admitting evidence under Rule 404(b) that Sterling illegally retained other classified documents in his home. The court limited the jury's consideration of this evidence to Sterling's state of mind and provided a lengthy limiting instruction (at Sterling's request) to eliminate any possibility that the evidence would be misused. In any event, there is no likelihood that the evidence—which was only briefly shown to the jury during the trial and was a very small part of the government's overall case—caused Sterling any unfair prejudice.

# ARGUMENT

## I.    THERE WAS SUFFICIENT EVIDENCE OF VENUE

Sterling contends (Br. 19-30) that there was insufficient evidence from which the jury could find venue in the Eastern District of Virginia for Counts 1 through 9.  He is mistaken.

### A.    Standard Of Review

Sterling asserts (Br. 20) that review is *de novo*, but that is only partially true.  Whether established facts or the allegations of an indictment satisfy constitutional venue requirements is a question of law subject to plenary review.  *See United States v. Engle*, 676 F.3d 405, 412, 415 (4th Cir. 2012) (pretrial motion to dismiss indictment); *United States v. Newsom*, 9 F.3d 337, 338 (4th Cir. 1993) (same); *United States v. Jefferson*, 674 F.3d 332, 364 (4th Cir. 2012) (undisputed facts, citing *Newsom*).  But where, as here, a defendant challenges the sufficiency of evidence supporting a jury's finding of venue, ordinary sufficiency standards apply.  *United States v. Burns*, 990 F.2d 1426, 1431 (4th Cir. 1993); *see Engle*, 676 F.3d at 418.

Venue "is not a substantive element of a crime" and may be proved "by mere preponderance of the evidence."  *Engle*, 676 F.3d at 412 (citation omitted); *see United States v. Manigan*, 592 F.3d 621, 631 (4th Cir. 2010) (preponderance standard "simply requires the trier of fact to believe that the

existence of a fact is more probable than its nonexistence") (citation omitted).

Sufficiency review is "limited" to determining "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found" venue under this standard. *Musacchio v. United States*, 136 S. Ct. 709, 715 (2016) (citation omitted). An appellate court merely seeks to assure that the jury's verdict comports with "the minimum that due process requires"; it does not "intrude on the jury's role to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* (citation omitted); *Burns*, 990 F.2d at 1431.

## B.    Legal Principles

The Constitution grants criminal defendants the right to a trial in the state and district where the crime was "committed." U.S. Const. art. III, § 2, cl. 3; *id.* amend. VI; *see* Fed. R. Crim. P. 18 ("Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed.").

The requirements for establishing venue are well settled. "[A] court must initially identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts." *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999). In determining the nature of the crime, courts look to the statutory language—including "the

verbs of the statute"—to determine the "essential conduct element[s]" of the offense. *Id.* at 279-80; *United States v. Ebersole*, 411 F.3d 517, 524 (4th Cir. 2005); *United States v. Bowens*, 224 F.3d 302, 309-11 (4th Cir. 2000). Venue is appropriate in a district if at least one essential conduct element occurred there, even if "the gravamen of the wrongdoing took place elsewhere." *United States v. Smith*, 452 F.3d 323, 334 (4th Cir. 2006).

Essential conduct need not be committed *entirely* within one district, however. In the case of crimes "begun in one district and completed in another, or committed in more than one district," the government may prosecute the offense "in any district in which such offense was begun, continued, or completed." 18 U.S.C. 3237(a). Likewise, crimes "involving the use of the mails, transportation in interstate or foreign commerce, or the importation of an object or person into the United States" may be "prosecuted in any district from, through, or into which such commerce, mail matter, or imported object or person moves." *Id.* Thus, for example, venue would lie in a district from which a fraudulent mailing or wire transmission is sent, *Ebersole*, 411 F.3d at 527; interstate travel is commenced, *Burns*, 990 F.2d at 1436-37; or online conversations are begun, *Engle*, 676 F.3d at 417-18. The government may choose to prosecute such offenses in any district where some essential criminal conduct took place. *Smith*, 452 F.3d at 334, 336. As with other

requirements for criminal conviction, a jury may rely entirely on circumstantial evidence to establish venue. *Engle*, 676 F.3d at 412.

## C. The Jury's Findings Of Venue On Each Count Were Supported By Sufficient Evidence

When "a defendant is charged with multiple crimes, venue must be proper on each count." *Ebersole*, 411 F.3d at 524. There was sufficient evidence from which the jury could find venue in this case.

### 1. *Count 3*

Count 3 alleged that, from about January 31, 2002 (the date of Sterling's termination from the CIA) to around April 30, 2003 (the date of Risen's meeting with Dr. Rice and Director Tenet), Sterling "willfully retain[ed]" in the Eastern District of Virginia a copy of the letter Merlin gave to the Iranian IAEA official, in violation of 18 U.S.C. 793(e). JA55. Sterling has conceded that willful retention of the document was essential conduct for this count. *See* JA2365-66, 2368-71. There was ample evidence that the retention occurred in the Eastern District of Virginia.

Merlin testified that he gave Sterling (and only Sterling) a hard copy of the final version of the letter shortly before leaving on his mission to Vienna in February 2000. JA2953. The version Merlin gave Sterling contained last-minute changes Sterling made at the direction of his supervisor and does not

appear in any cables or other documents concerning the program.  JA1195-97, 2594-97.  Risen reprinted this final version of the letter, verbatim, in *State of War*.  JA2625-26.  The jury found that Sterling gave Risen the letter, and Sterling does not challenge that finding on appeal.

The evidence showed that Sterling unlawfully retained the letter prior to leaving the CIA in January 2002, because he lost access to classified material when he was outprocessed from the agency on October 31, 2001, and lost access to all CIA documents and facilities upon his termination.  *See* JA1941-48, 2782-86.[6]  The evidence further showed that Risen received the letter from Sterling in the spring of 2003:  Risen admitted to Dr. Rice and Director Tenet during the April 30 meeting (after several weeks of communications with Sterling) "that he had seen a letter to the Iranians from the Russian which had told them that the program was flawed."  JA1420, 2656.

The only place Sterling lived between these dates—indeed, the only place he was known to be at all—was in Herndon, Virginia, where he was

---

[6] Indeed, Sterling obtained the letter well before January 2002.  Sterling had to relinquish his files regarding Classified Program No. 1 when his assignment ended in May 2000; he had no further access to information concerning the program after that date; and the files were destroyed in the September 11, 2001 terrorist attacks.  JA1217-19, 1382, 1468, 2608; *see* JA933-34, 959, 1004-05.  Sterling must, therefore, have retained the letter before leaving Classified Program No. 1 and brought it with him to the Eastern District of Virginia when he transferred to CIA headquarters in August 2000. *See* JA2760.

unemployed and working on his memoirs. JA1987, 2668-73, 2677-86. Having found that Sterling willfully retained the letter, the jury could easily conclude that, more likely than not, he did so in the Eastern District of Virginia. *Cf. United States v. Leong*, 536 F.2d 993, 996 (2d Cir. 1976) (holding that, for venue purposes, defendant's "residency in Manhattan would be sufficient circumstantial evidence, if not of the receipt of the heroin in the Southern District, certainly of his possession of it in that District").

Sterling dismisses this evidence as "speculative." Br. 25-28. Like many of his sufficiency arguments, that assertion is inconsistent with the principle that a jury may rely entirely on circumstantial evidence and may draw reasonable inferences without excluding every contrary hypothesis.[7] *See United States v. Gray*, 137 F.3d 765, 772 (4th Cir. 1998) (en banc); *United States v. Zayyad*, 741 F.3d 452, 464 (4th Cir. 2014); *United States v. Osborne*, 514 F.3d 377, 387 (4th Cir. 2008). Jurors are "entitled to deduce and to infer" from circumstances based on their "common experience and . . . reasonable intuitions" about what most likely occurred. *United States v. Ashley*, 606 F.3d 135, 140 (4th Cir. 2010). The jury had ample grounds to find that Sterling more likely than not possessed the letter in the only place he was known to be

_____

[7] The district court instructed the jury in a manner consistent with these principles, without objection from Sterling. *See* JA2287-91.

during the relevant time period. It is Sterling, not the government, who engages in "rank speculation," *id.*, by asserting that the jury should have found it equally or more likely that he retained the letter in some other district—of which there is *no* evidence.[8]

### 2. *Counts 4 and 5*

Counts 4 and 5 relate to Sterling's transmission of classified information to Risen. Count 4 charged Sterling with "willfully communicat[ing], deliver[ing], and transmit[ting]" information about Classified Program No. 1 that he possessed lawfully (*i.e.*, information Sterling learned during his employment, which he was permitted to remember but not disclose), in violation of 18 U.S.C. 793(d). JA56. Count 5 charged Sterling with the same offense with respect to information he was not authorized to possess (*i.e.*, Merlin's letter), in violation of 18 U.S.C. 793(e). JA57. Venue was proper on both of these counts.

As with other crimes involving communication, delivery, and transmission of information, *e.g.*, 18 U.S.C. 1341 (mail fraud); 18 U.S.C. 1343 (wire fraud), Section 793 encompasses offenses that may cross the borders of

---

[8] Sterling's reliance on *United States v. Evans*, 318 F.3d 1011 (10th Cir. 2003), is inapt. In that case, the government's proof of venue relied solely on a supposed "presumption" that "law enforcement officers of a particular jurisdiction act within that jurisdiction." *Id.* at 1022. The government seeks no such presumption here.

judicial districts. *See* Webster's Third New Int'l Dictionary 460 (1971) (defining "communicate" as "convey the knowledge or information of," "send information or messages sometimes back and forth"); *id.* at 597 (defining "deliver" as "make or hand over," "make delivery of," "send (something aimed or guided) to an intended destination"); *id.* at 2429 (defining "transmit" as "cause to go or be conveyed to another person or place"). In such cases, venue is proper in any district where the communication, delivery, or transmission commenced. 18 U.S.C. 3237(a).

Taking Count 5 first, the jury could conclude that, because Sterling kept the letter in the Eastern District of Virginia, he likely communicated, delivered, and transmitted it to Risen from that district. Sterling makes much of the fact that he could not have transmitted the letter by telephone, Br. 23, and the government never argued otherwise. Sterling provided Risen with a physical copy of the letter—Risen admitted to Dr. Rice and Director Tenet during the April 30, 2003 meeting that he had seen the letter, and he reprinted it verbatim in *State of War*. JA1420, 2625-26, 2656. Although the government did not have direct evidence of how the transmission occurred, it did not need such evidence to establish venue. Whether Sterling sent the letter to Risen by mail, wire, courier, or hand delivery, the fact that Sterling possessed the letter in the Eastern District of Virginia means that is where the process of transmission

27

likely commenced. *See, e.g.*, *United States v. Cabrales*, 524 U.S. 1, 8 (1998) ("acquir[ing] [laundered] funds in one district and transport[ing] them into another" would be triable in either district); *United States v. Hankish*, 502 F.2d 71, 76 (4th Cir. 1974) (finding venue under Section 3237(a) where transportation of stolen goods began in district); *United States v. Rodriguez*, 587 F.3d 573, 582 (2d Cir. 2009) (same where transportation of aliens began in district); *Engle*, 676 F.3d at 417-18 (same where wire communication began in district); *Ebersole*, 411 F.3d at 527 (same).

As for Count 4, the jury could infer that Sterling disclosed information about Classified Program No. 1 during the telephone calls he made to Risen from the Eastern District of Virginia between February 27 and March 29, 2003. JA2801-02. Sterling contends (Br. 23-25) that he was only accused of using these calls to set up meetings and for other "preparatory acts," but that is wrong: the paragraph of the indictment he cites alleges that Sterling "communicat[ed] by telephone" with Risen "to arrange for the disclosure of *or to disclose classified information.*" JA42 (emphasis added). Sterling's other argument—that the calls were too short to disclose "anything of substance," Br. 23—is also wrong. Sterling and Risen spoke for 50 seconds on February 27 and a minute-and-a-half each on March 16 and 20. JA2801-02. Although

Sterling could not have told Risen the entire story of Classified Program No. 1 in that time, he certainly could have disclosed national defense information.

Sterling concedes, for example, that the jury could have found that he called Risen on February 27 to arrange a meeting. Br. 24. Given that this occurred a year after their last known communication (regarding Risen's article about Sterling's discrimination suit), the jury could reasonably have inferred that Sterling provided some explanation for why he suddenly wanted to resume contact; even saying he had information about a plan to disrupt Iran's nuclear program would have been unlawful. The evidence also showed that the calls on March 16 and 20 occurred *after* Sterling and Risen discussed Classified Program No. 1. In his March 10 email to Risen, for example, Sterling forwarded a CNN report on Iran's "'extremely advanced' nuclear program" and asked, "quite interesting, don't you think? All the more reason to wonder . . . ." JA2815-22. This strongly indicated that, by March 10, Sterling and Risen had already talked about the Iranian nuclear program and Sterling's purported concerns about how it became so "advanced."[9] By April, Risen had written a draft story about Classified Program No. 1. JA1413-15, 2655-56. The jury could infer from this chronology that the March 16 and 20

---

[9] Sterling effectively concedes this point in his brief. *See* Br. 24 (acknowledging that "the CNN Email suggests that Sterling and Risen may have *already* discussed the Program by March 10, 2003").

calls were not mere "preparation" for disclosing classified information; the more likely explanation is that Sterling and Risen discussed and confirmed details about information Sterling had already disclosed. Particularly under a preponderance standard, and given the need to credit all inferences in favor of the verdict, the jury's conclusion was not unreasonable.

### 3.   *Counts 6 and 7*

Counts 6 and 7 are attempt counts:  they allege that Sterling willfully attempted to communicate, deliver, and transmit information about Classified Program No. 1 (Count 6) and the letter (Count 7) to members of the general public through distribution of the article Risen wrote for *The New York Times*. JA58-59; 18 U.S.C. 793(d), (e).  Although Sterling lumps these counts together with Counts 4 and 5, *see* Br. 22, they are not the same.

An attempt offense "punishes conduct that puts in motion events that would, from the defendant's point of view, result in the commission of a crime but for some intervening circumstance." *United States v. Pratt*, 351 F.3d 131, 135 (4th Cir. 2003).  The jury need only find that a defendant had the intent to commit a substantive offense and took "a substantial step toward completion of his goal." *United States v. Resendiz-Ponce*, 549 U.S. 102, 107 (2007); *see Pratt*, 351 F.3d at 136 (substantial step "need not be the last possible act before" the crime is committed).   "[S]oliciting an innocent agent to engage in conduct

constituting an element of the crime" is punishable as an attempt. *Id.* at 136 (quoting Model Penal Code § 5.01(2)).

Sterling states no reason why the jury could not have inferred, by a preponderance of the evidence, that at least one such act took place in the Eastern District of Virginia. Sterling's disclosure of the letter and other information concerning Classified Program No. 1 to Risen—a reporter whose job it was to disseminate information to a national audience, and who had twice published information in *The New York Times* that he received from Sterling—was a substantial step toward Sterling's goal. Sterling's criminal intent would have metastasized into a completed crime were it not for the intervention of Dr. Rice, Director Tenet, and *Times* management. Because the jury could have found that the transmission of the letter and other information began in the Eastern District of Virginia, it likewise could have found that essential conduct constituting an attempt occurred in that district.

But that is not the only way the jury could have found venue. The jury could have concluded, for example, that Sterling's March 10, 2003 email to Risen—which Sterling concedes was likely sent from Virginia, Br. 24—was intended to convince Risen that Sterling's claims were newsworthy and should be published. The jury could also have inferred from the longstanding reporter-source relationship between Risen and Sterling that at least one of the

purposes of their telephone contact between February 27 and March 29 was to facilitate the publication of Risen's article by confirming details and fleshing out the story for eventual publication. Any of these findings would have been sufficient to establish venue for the attempt counts.[10]

### 4.    *Counts 1, 2, and 9*

Counts 1, 2, and 9 charged Sterling with willfully *causing* the disclosure of Merlin's letter and other information about Classified Program No. 1 to the general public through the publication, distribution, and delivery of *State of War*, in violation of 18 U.S.C. 793(d) and (e) and 18 U.S.C. 641. JA52-54, 61. The district court instructed the jury that, to convict Sterling on these counts, it did not need to find that he was "present when [the criminal act] was performed, or [was] aware of the details of its execution"; it was enough that he intended to do "something the law forbids" and "voluntarily and intentionally" caused others to commit the offense. JA2311-12.

---

[10]    Sterling notes (Br. 22) that the jury had to find that he "willfully communicated, delivered, [or] transmitted" national defense information to be convicted on Counts 6 and 7. JA2305-06. That is true (Sterling had to give the information to Risen before persuading him to publish it), but the jury did not have to find that those particular acts occurred in the Eastern District of Virginia. *See Smith*, 452 F.3d at 334 (venue may be proper even if "the gravamen of the wrongdoing took place elsewhere"). Sterling challenges the sufficiency of evidence of venue, not substantive guilt: even if the transmission of classified information occurred elsewhere, venue on Counts 6 and 7 would be proper because other "substantial step[s] toward completion" of the crime occurred in the district. *Resendiz-Ponce*, 549 U.S. at 107.

Sterling does not challenge the jury's finding that he caused the disclosures in *State of War*. His only claim (Br. 28-30) is that there was insufficient evidence that he did so in the Eastern District of Virginia. That is incorrect. For one thing, Sterling concedes (Br. 28-29) that the jury could have found that he caused the disclosures by providing information to Risen, a journalist tasked with reporting on such matters to a national audience. Because there was sufficient evidence that at least some of the illegal communications began in the district, the jury had sufficient evidence to find venue for the causation counts as well. *See supra* at 26-30.

But even if that were not true, the government proved that *State of War* was distributed widely in the Eastern District of Virginia, which is sufficient to establish venue on the causation counts. Barnes & Noble bookstores in the district, for example, received and sold hundreds of copies of the book. JA2015-17, 2842-48, 2866. Sterling contends that conduct he caused to happen cannot be "imputed" to him for venue purposes, Br. 29-30, but that is wrong. It is well established that a defendant who causes the commission of a crime in a district, including the transmission of information into a district, may be prosecuted there even if his personal conduct occurred elsewhere. *See Salinger v. Loisel*, 265 U.S. 224, 234-35 (1924) (venue for mail fraud proper where defendant "caused" mail to be delivered); *United States v. Johnson*, 510

F.3d 521, 525 (4th Cir. 2007) ("[C]ausing the transmission of fraudulent information into a district is enough to establish venue in that district."); *Ebersole*, 411 F.3d at 527 (same); *United States v. Stewart*, 256 F.3d 231, 243 (4th Cir. 2001) (same for defendant who caused others to transmit money from district); *United States v. Blecker*, 657 F.2d 629, 632-33 (4th Cir. 1981) (same for defendant who causes intermediary to submit false claim in district).[11]

Sterling complains that, under this principle, he could be tried "in any district where *State of War* was sold." Br. 30. There is nothing wrong with that. A defendant whose "criminal scheme inherently contemplates activities throughout many parts of the country" "can hardly complain" that he is subject to prosecution in all of them. *United States v. Royer*, 549 F.3d 886, 893, 895 (2d Cir. 2008); *cf. United States v. Lombardo*, 241 U.S. 73, 77 (1916) ("Undoubtedly where a crime consists of distinct parts which have different localities the whole may be tried where any part can be proved to have been done."). In such cases, "the choice among acceptable fora is one for the prosecution." *Smith*, 452 F.3d at 336. Nor is there any requirement that trial in a particular venue be foreseeable to the defendant. *Johnson*, 510 F.3d at 527

---

[11] *United States v. Foy*, 641 F.3d 455 (10th Cir. 2011) (cited at Br. 30), is not to the contrary. The defendant in *Foy* was charged with attempted drug distribution that occurred entirely in another district; he was not charged with causing a crime that occurred in the district of prosecution. *Id.* at 467 & n.3.

("[V]enue is similar in nature to a jurisdictional element" and "typically lacks any sort of explicit knowledge or foreseeability prerequisite.").  Sterling may be prosecuted in any district where he caused the distribution of classified material through *State of War*, just as a defendant who causes the distribution of illegal material online may be prosecuted in any district where the material is downloaded.  *See Royer*, 549 F.3d at 895 (fraudulent Internet posts); *United States v. Rowe*, 414 F.3d 271, 279 (2d Cir. 2005) (child pornography); *United States v. Reigle*, 228 F. App'x 353, 356 (4th Cir. 2007) (same).

There is, however, no need to confront those questions here.  Even if it were appropriate for a court to attempt to differentiate among various districts where criminal conduct occurred when deciding venue, the Eastern District of Virginia would qualify.  After all, that is the district where Sterling lived and worked; where he contacted Risen by telephone and email; and where the agency involved was located.

## II.  THE DISTRICT COURT'S VENUE INSTRUCTION WAS CORRECT

Sterling claims (Br. 31-39) that, even if there was sufficient evidence of venue, the district court's venue instruction was erroneous and warrants a new trial on Counts 1 through 9.  That argument lacks merit.

### A.  Standard Of Review

This Court reviews jury instructions *de novo*, and reviews the district court's refusal to give a defendant's preferred instruction for abuse of discretion.  *United States v. McLaurin*, 764 F.3d 372, 378-79 (4th Cir. 2014).

### B.  Background

The district court instructed the jury that "a defendant has a right to be tried in the district where the offense was committed."  JA2319.  The court further instructed the jury that it needed to find "that it is more likely than not that at least one act in furtherance of [each] offense occurred in the Eastern District of Virginia."  *Id.*

During the second day of deliberations, the jury submitted a note asking whether, for purposes of Count 3, there was any significance to the fact that the government argued that Sterling possessed the letter in his home but the statute did not contain such a limitation.  JA2364.  In responding to the jury's question—and at Sterling's request, JA2368-70—the court instructed the jury it

had to find "that the willful retention [of the letter] occurred in the Eastern District of Virginia by a preponderance of the evidence" to establish venue. JA2372. The court further instructed that this requirement was the same as "the venue issue that I explained to you" previously. *Id.*

## C. The Venue Instruction Was Accurate

Sterling contends that the venue instruction was inaccurate because it did not reflect the principle "that venue is proper only where an 'essential conduct element' of the offense occurred." Br. 33. In Sterling's view, the instruction permitted the jury to convict based solely on the commission of "preparatory acts" that did not form any part of the crime itself. *Id.* at 33-34. That is incorrect.

In *Bowens*, this Court held that "venue for a criminal prosecution must be determined solely in reference to the essential conduct elements of the charged offense." 224 F.3d at 314. The Court has never varied from that principle, nor has the government argued otherwise. The only issue is *where* the essential conduct occurred. The answer to that question was straightforward in *Bowens*: the defendant harbored a fugitive entirely within another district, and the only connection to the district of prosecution was the issuance of the arrest warrant for the fugitive, a "circumstance element" that was not sufficient to establish venue. *Id.* at 310-11. But the question is more complicated in cases involving

multi-district or continuing offenses. In those cases, Congress has provided for venue in "the whole area through which force propelled by an offender operates," *United States v. Johnson*, 323 U.S. 273, 275 (1944), and there is no requirement that the essential conduct, or even a single act, take place entirely within the district, 18 U.S.C. 3237(a); *see Engle*, 676 F.3d at 417 (noting that "*Bowens* did not involve [Section] 3237(a)"); *Reass v. United States*, 99 F.2d 752, 754 (4th Cir. 1938) (distinguishing between venue for a criminal act that crosses jurisdictional boundaries and an act that "occurs at one time and at one place in which only it may be tried").

In *Ebersole*, this Court held that the "act in furtherance" instruction used in this case was a permissible means of describing venue for continuing offenses. 411 F.3d at 525-27. *Ebersole* reaffirmed *Bowens*'s essential-conduct requirement, *id.* at 524, but concluded that defining venue as the place where an "act in furtherance" of the crime occurred appropriately conveyed the principle that, under Section 3237(a), essential conduct includes acts that begin in one district and are propelled into others, with venue being proper in any district where part of the criminal act occurs. *Id.* at 527. *Bowens*'s statement that "venue is limited to the place where the essential conduct elements occur," 224 F.3d at 309, though true as a general matter and an appropriate

instruction on the facts of that case, does not map neatly onto cases like this one, where individual criminal acts expand into multiple places.

The district court did not "misunderst[and] that principle." Br. 36. At the charge conference, the court explained that requiring "an act in furtherance of the crime [to have] occurred in the district" was consistent with the rule that, in cases involving "multiple districts," venue is appropriate "as long as *part of the criminal act* took place in that district." JA2189 (emphasis added).[12] The court instructed the jury that venue requires proof that "*the offense was committed*" in the district of prosecution, blunting any likelihood that the jury thought it could base its finding solely on non-criminal preparation. JA2319 (emphasis added). And the court later clarified that Count 3 (which was not a continuing offense) required proof that Sterling willfully retained Merlin's letter in the Eastern District of Virginia—a clarification Sterling acknowledged was correct and specifically requested—and linked that instruction to the venue requirements for other counts. JA2365-66, 2368-72. *See Weeks v.*

---

[12] Sterling repeatedly cites the district court's earlier comment, made outside the jury's presence, that the "essential conduct element" language in *Bowens* was not "the law any longer." JA2111. The court explained, however, that it was not suggesting that essential conduct elements are irrelevant, only that in instructing the jury, the language approved in *Ebersole* more accurately described the test for continuing offenses and avoided suggesting that "the key or most dramatic events" had to occur entirely within the district. *Id.* In any event, this Court "review[s] judgments, not opinions." *Pashby v. Delia*, 709 F.3d 307, 322 (4th Cir. 2013) (citation omitted).

*Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions . . . [and] to understand a judge's answer to its question.").

Sterling attempts to distinguish *Ebersole* because it involved wire fraud, which consists of "transmit[ting] or caus[ing] to be transmitted" a wire communication "for the purpose of executing" a fraud. 18 U.S.C. 1343. Because the statute prohibits "causing a wire to be transmitted in furtherance of a fraud," 411 F.3d at 527 (citation omitted), Sterling contends that the *Ebersole* instruction applies only to fraud offenses. Br. 36. But *Ebersole* focused on the continuing nature of the offense and required proof of where "fraudulent wires [were] transmitted," 411 F.3d at 525-27 & n.9 (citation omitted), just as Sterling's jury needed to find where classified information was transmitted. *See Jefferson*, 674 F.3d at 367 (fraudulent "mailing or wire transmission itself" is "the *actus reus*" of mail or wire fraud). It would not have been sufficient in *Ebersole* to rely on preparatory acts or communications arranging the fraudulent scheme, *see id.* at 367-68; *United States v. Ramirez*, 420 F.3d 134, 141 (2d Cir. 2005), just as acts preparing to transmit classified information would have been insufficient here. *Ebersole*'s approval of the "act in furtherance" instruction for the continuing offense of wire fraud supports the use of the same instruction in this case.

Nor is there merit to Sterling's claim that the instruction is inconsistent with *United States v. Stewart*, 256 F.3d 231 (4th Cir. 2001), and *United States v. Strain*, 396 F.3d 689 (5th Cir. 2005). *Stewart* holds that a money launderer cannot be charged in a district where the money originated unless he caused the money to be transmitted from that district. 256 F.3d at 240, 243. *Strain* holds that making plans to harbor a fugitive does not establish venue when the actual harboring occurred in another district. 396 F.3d at 697. Neither addresses a circumstance like that here, where the actual transmission of classified information either began or ended in the district.[13]

### D.    Any Error Was Harmless

Regardless, any error in the instruction was harmless. *See United States v. White*, 810 F.3d 212, 221 (4th Cir. 2016). As explained, there was ample evidence from which the jury could find that, for each count, Sterling more likely than not engaged in essential conduct in the Eastern District of Virginia. Moreover, the district court cured any error in the original instruction by clarifying that the conduct alleged in Count 3 (willfully retaining the letter) had to occur in the Eastern District of Virginia, which the court explained was

---

[13] To the extent *United States v. Georgacarakos*, 988 F.2d 1289 (1st Cir. 1993) (cited at Br. 37-38), suggests that a similar instruction may only be given in conspiracy and aiding-and-abetting cases, it is inconsistent with the controlling precedent in *Ebersole*.

consistent with the overall venue instruction for all counts. JA2372. At a minimum, the clarification resolved any ambiguity concerning Count 3, and Sterling concedes there is no venue concern on Count 10, so those convictions and concurrent sentences should be affirmed.[14]

---

[14] Sterling argues (Br. 37 n.19) that he should still get a new trial because the original instruction and the clarification "contradicted one another." He is wrong about that, but more fundamentally, he cites the wrong legal principle. Sterling relies on cases involving inconsistent instructions in the original charge. *See United States v. Varner*, 748 F.2d 925, 926-27 (4th Cir. 1984); *United States v. Walker*, 677 F.2d 1014, 1016 n.3 (4th Cir. 1982). No such concern arises when a court gives a *supplemental* instruction. *See United States v. Smith*, 62 F.3d 641, 645-46 (4th Cir. 1995). And Sterling is in a poor position to argue otherwise, given that he asked the district court to give the supplemental instruction it did. *See United States v. Quinn*, 359 F.3d 666, 674-75 (4th Cir. 2004) (defendant cannot challenge instruction he requested).

## III. THE EVIDENCE WAS SUFFICIENT TO SHOW THAT STERLING OBSTRUCTED JUSTICE

Count 10 charged Sterling with obstructing the grand jury's investigation into the disclosure of information concerning Classified Program No. 1 by destroying his March 10, 2003 email to Risen. JA62-63. Sterling concedes that venue was appropriate on this count, Br. 19, but argues that the jury lacked sufficient evidence to convict, *id.* at 39-45. That is incorrect.

### A. Standard Of Review

The standard of review is set forth in Part I. *Supra* at 21; *see United States v. Penniegraft*, 641 F.3d 566, 571-72 (4th Cir. 2011) (same in reviewing denial of sufficiency claim raised in Rule 29 motion).

### B. Background

On April 19, 2006, Sterling's email provider, Hotmail, preserved a "snapshot" of his email account at the FBI's request. JA2849, 1956 (explaining that snapshot "preserve[s] all the data in that e-mail account on that day"). Among the preserved emails was Sterling's March 10, 2003 message to Risen regarding Iran's "'extremely advanced' nuclear program." JA1960-62, 2815-22.

On June 16, 2006, the FBI served Sterling with a subpoena directing him to produce documents to a grand jury investigating the disclosure of

information about Classified Program No. 1. JA1963-64, 2851-52. Among other things, the subpoena ordered Sterling to produce "[a]ny and all correspondence between you and any person not employed by the CIA concerning the CIA or any of its operations, sources, assets, or methods." JA2852. The FBI also gave Sterling a letter informing him, for the first time, that he was a target of the investigation. JA1965.

On July 14, 2006, Hotmail preserved another snapshot of Sterling's email account. JA1957-58, 2853. This snapshot was essentially the same as the April snapshot, with one notable exception: the March 10, 2003 email was gone. JA1960-61, 1965-66.

### C. The Jury Had Sufficient Evidence To Find That Sterling Deleted The Email With Intent To Obstruct The Grand Jury's Investigation

Sterling's sufficiency challenge boils down to two claims: (1) a rational jury could not infer that he deleted the email after receiving the subpoena and target letter; and (2) even if it could, the jury could not have found that he acted with intent to obstruct the grand jury's investigation. He is wrong on both counts.

Like his sufficiency challenges regarding venue, Sterling's first claim is inconsistent with the principle that a jury may draw logical inferences from circumstantial evidence. *See Gray*, 137 F.3d at 772. Only three months

elapsed between the April and July snapshots, and only one significant event occurred in the interim: Sterling became aware, for the first time, that a grand jury was investigating his disclosure of classified information. The government established that there was no "considerable difference" between the two snapshots other than the deletion of the March 10, 2003 email, JA1966, and thus the deletion appeared to be targeted. The email was also highly incriminating, proving that Sterling communicated with Risen about the Iranian nuclear program just five days after Sterling met with Senate staff members to report his supposed "concerns" about Classified Program No. 1 and three weeks before Risen informed the CIA that he had received classified information about the program and intended to write a story that closely tracked Sterling's version of events.

Sterling suggests (Br. 42-43) that deletion of the email could have been an unfortunate coincidence: perhaps, he says, he deleted it sometime between the April snapshot and the June subpoena for an unspecified but innocuous reason; or perhaps Hotmail deleted it because it was in a trash folder or his inbox was full. Sterling did not advance these theories at trial, and neither is supported by any evidence.[15] Regardless, the government did not have to

---

[15] Sterling first advanced his Hotmail-deletion theory (without citing any evidence) in his post-trial motion for acquittal. JA2421-22. He conceded, however, that another "obvious explanation[]" for the email's disappearance

disprove every scenario of possible innocence before a rational jury could infer Sterling's guilt. *See Gray*, 137 F.3d at 772; *Osborne*, 514 F.3d at 387. The email was the only direct evidence that Sterling and Risen communicated about the Iranian nuclear program during the relevant time period, and Sterling stored it in his email account for years until it suddenly vanished between April and July 2006. The jury was not required to believe this was a coincidence.

Sterling's second claim—that there was insufficient evidence of culpable intent—is likewise incorrect. Sterling was convicted of violating 18 U.S.C. 1512(c)(1), which prohibits "corruptly" destroying a document or other object "with the intent to impair the object's integrity or availability for use in an official proceeding." "[E]vidence of intent will almost always be circumstantial," and a defendant "may be found culpable where the reasonable and foreseeable consequences of his acts are the obstruction of justice." *United States v. Brooks*, 111 F.3d 365, 372 (4th Cir. 1997) (citing analogous provision of 18 U.S.C. 1503). Justice need not "in fact [be] obstructed," *id.*, nor does Section 1512(c)(1) require that a proceeding be pending at the time of the obstructive acts, *see* 18 U.S.C. 1512(f)(1); *Arthur Andersen LLP v. United States*, 544 U.S. 696, 707-08 (2005) (proceeding need only "be foreseen"). Proof that

---

between April and July 2006 was that "Mr. Sterling deleted the email during that period." JA2421. The Court must credit that "obvious explanation[]" at this stage.

the defendant's actions had "the natural and probable effect of interfering with the due administration of justice" is sufficient. *United States v. Aguilar*, 515 U.S. 593, 599 (1995) (citation omitted); *Brooks*, 111 F.3d at 372.[16]

Sterling argues that, even if he did delete the email after receiving the subpoena and target letter, he could not have foreseen that this action would affect the grand jury's investigation because the email "was not among the categories of documents requested by the grand jury's subpoena." Br. 44-45. That argument is wrong for two reasons.

First, it ignores the email's context. Although the message and attached article do not *directly* identify "the CIA or any of its operations, sources, assets, or methods," JA2852, the jury could easily have concluded that Sterling's comments to Risen about Iran's "'extremely advanced' nuclear program" ("[Q]uite interesting, don't you think? All the more reason to wonder . . .") were references to his supposed concern that Iran acquired valuable nuclear technology from the CIA as a result of Classified Program No. 1, which Sterling hoped the article would validate. JA2815-22; *see* Br. 24 (conceding that, "viewed most charitably to the government, the CNN Email suggests that Sterling and Risen may have *already* discussed the Program by March 10,

---

[16] The district court's instructions to the jury were consistent with these principles. *See* JA2318.

2003"). Indeed, that interpretation was unavoidable given the jury's finding on other counts that Sterling was Risen's source of information concerning Classified Program No. 1—a finding Sterling does not challenge on appeal. As the district court concluded in denying Sterling's motion for acquittal, Sterling would have known that the email "concern[ed]" his work at the CIA, and thus was called for by the subpoena. JA2102-03, 2852.

Second, and regardless, a defendant obstructs justice when he destroys evidence that is foreseeably relevant to a grand jury investigation, whether or not it is subject to a subpoena. *See United States v. Gravely*, 840 F.2d 1156, 1160 (4th Cir. 1988) ("The documents do not have to be under subpoena, it is sufficient if the defendant is aware that the grand jury will likely seek the documents in its investigation.").[17] A grand jury's investigation is not limited to a particular subpoena, *see United States v. Calandra*, 414 U.S. 338, 343-44 (1974), and it would be inconsistent with the broad reach of the obstruction statutes—and with common sense—to say that a defendant may destroy

---

[17] *See United States v. Binday*, 804 F.3d 558, 590-91 (2d Cir. 2015) (affirming obstruction conviction where defendant destroyed evidence to prevent possible use in future grand jury proceeding); *United States v. Johnson*, 655 F.3d 594, 606 (7th Cir. 2011) (same where defendant foresaw that evidence "might be used in an official proceeding and destroyed it with the intent of preventing that use"); *United States v. Frankhauser*, 80 F.3d 641, 651-52 (1st Cir. 1996) (same where defendant urged confederate to discard evidence "not yet under subpoena" in order to "make [it] unavailable for use" in future grand jury proceeding).

evidence of his crime with impunity as long as a grand jury has not yet become aware of its probable existence and specifically requested it.

None of the cases on which Sterling relies suggest a contrary result. It is true that destroying a document one knows to be called for by a grand jury subpoena is obstructive, *see United States v. Quattrone*, 441 F.3d 153, 171-73 & n.19 (2d Cir. 2006)—and, as explained, the jury had sufficient grounds to find that is what Sterling did. But it is not required.[18] Other cases he cites reinforce that principle. *See United States v. Petruk*, 781 F.3d 438, 445 (8th Cir. 2015) (defendant need only "contemplate[] a particular, foreseeable proceeding" he intends to obstruct); *United States v. Simpson*, 741 F.3d 539, 552 (5th Cir. 2014) (affirming conviction where defendant deleted email that would have been relevant to "an official proceeding that he anticipated would occur"); *United States v. Friske*, 640 F.3d 1288, 1292 n.5 (11th Cir. 2011) (government need only "prove that the defendant knew of or foresaw an official proceeding, and knew that his actions were likely to affect it").

Whether or not Sterling was specifically required to produce the email in response to the grand jury's initial subpoena, the jury could conclude that the

---

[18] Notably, *Quattrone* involved a conviction under Section 1503, which requires obstruction of an actual grand jury proceeding. *See* 441 F.3d at 170. Sterling was convicted of violating Section 1512(c)(1), which covers obstruction of actual *and future* proceedings. *See* 18 U.S.C. 1512(f)(1).

email was evidence of Sterling's crime, that Sterling was aware of that fact, and that he destroyed it in an attempt to hinder the grand jury's efforts to determine who told Risen about Classified Program No. 1. That evidence is sufficient to support his conviction.[19]

---

[19] Sterling argues (Br. 45-47) that if the Court upholds his obstruction conviction but reverses his convictions on any other counts, it should remand to the district court for resentencing on Count 10. That is unnecessary. The district court expressly said that its sentence (which reflected a substantial downward variance from the Guidelines) "would have been the same were it a conviction of one count or of all of th[e] counts." JA2526-27.

## IV.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ADMITTING EVIDENCE THAT STERLING KEPT CLASSIFIED DOCUMENTS AT HIS HOME

Sterling contends (Br. 47-57) that the district court abused its discretion by admitting evidence that he kept classified documents unrelated to Classified Program No. 1 at his home.  That argument lacks merit.

### A.   Standard Of Review

A district court's admission of evidence under Federal Rule of Evidence 404(b) is reviewed for abuse of discretion.  *United States v. Byers*, 649 F.3d 197, 206 (4th Cir. 2011).  This Court "will not find a district court to have abused its discretion unless its decision to admit evidence under Rule 404(b) was arbitrary and irrational."  *Id.* (citation omitted).

### B.   Background

In October 2006, the FBI executed a search warrant at Sterling's home in Missouri.  JA2017-18.  By that point, Sterling had transferred Merlin's letter to Risen.  But Sterling had not disposed of everything he took from the CIA:  the search revealed four classified documents, unrelated to Classified Program No. 1, concealed in Sterling's home.  JA2017-18, 2730.  One was a copy of Sterling's performance appraisal from 1993, which contained classified information about his work.  JA345, 1823-24, 1827, 2724-25.  The others

concerned operational issues related to the use of telephones.  JA345, 1821-22; Gov't Exhs. 142-144.  All were marked "Secret."

These documents were supposed to remain in a CIA facility; Sterling was not legally authorized to take them home, much less keep them after his employment at the CIA ended.  *See* JA1392-93, 1895-96, 1942-47, 2701-02, 2716.  Because Sterling could not have obtained these documents after losing his job in January 2002, the most likely explanation for how they ended up in his house in Missouri was that he unlawfully removed them from a CIA facility before he was terminated and kept them with him as he moved, first at his home in Virginia (until August 2003), then at his two residences in Missouri.  JA1987-88, 2018, 2870.

The district court concluded that the documents were admissible under Rule 404(b) to establish Sterling's state of mind, including his *modus operandi* in stealing and retaining classified materials from the CIA.  JA439-40; Tr. of CIPA Hr'g (Dkt. No. 219) at 25; Tr. of CIPA Hr'g (Dkt. No. 280) at 37-38. The court decided, however, to limit the government's use of the information to mitigate any possible prejudice to Sterling.  The performance appraisal was redacted and presented to the jury as a declassified document, like many other exhibits in the trial.  JA1823, 1827, 2724-25.  The other documents remained

classified but were shown to the jury for only about one minute.  JA1820-21.[20]
The government was restricted to asking only a few prescreened questions
about the documents, establishing that they were classified and found in
Sterling's home.  JA1821-24, 1827, 2017-18; Dkt. No. 219 at 25-26.

The district court also instructed the jury—at Sterling's request, JA2194-
97—that the classified documents were not "any evidence or proof whatever
that at another time, the defendant performed a similar act, including the
offenses charged in the indictment."  JA2299.  The court explained that the
jury could not use the documents "in determining whether [Sterling] actually
performed the physical acts charged in th[e] indictment"; only after finding
"beyond a reasonable doubt from other evidence in the case standing alone"
that Sterling "did the acts charged in the indictment" could the jury consider
the classified documents for the limited purpose of "determining the state of
mind or intent with which [Sterling] act[ed]."  JA2299-2300; *accord* JA2300
("[T]he defendant is not on trial for any acts not alleged in the indictment.
Nor may [he] be convicted of the crimes charged even if you were to find that
he committed other acts, even acts similar to the one charged in this

---

[20]   The government offered to introduce unclassified versions of these
documents, but Sterling objected and the district court concluded that
redacting the documents would not be feasible.  Tr. of CIPA Hr'g (Dkt. No.
173) at 55; Dkt. No. 219 at 25.

indictment.").  The court further instructed the jury that it "should dr[a]w no inference as to [Sterling's] guilt" from the fact that the documents had classification markings and remained secret.  JA2292.

## C. The District Court's Evidentiary Ruling Was Not An Abuse Of Discretion

### 1. *Rules 404(b) and 403*

"Rule 404(b) prohibits evidence of 'other crimes, wrongs, or acts' solely to prove a defendant's bad character."  *Byers*, 649 F.3d at 206 (quoting Fed. R. Evid. 404(b)).  The rule provides, however, that such evidence may be admitted "'for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'"  *Id.* This is "an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove *only* criminal disposition."  *United States v. Siegel*, 536 F.3d 306, 317 (4th Cir. 2008) (citation omitted).

Three factors guide a court's decision to admit evidence under Rule 404(b).  First, the evidence must be "relevant to an issue other than character." *Byers*, 649 F.3d at 206 (citation omitted).  Relevance is "a low barrier to admissibility," *United States v. Basham*, 561 F.3d 302, 332 (4th Cir. 2009) (citation omitted), and merely requires that the evidence have a "tendency to make a fact more or less probable," Fed. R. Evid. 401; *Byers*, 649 F.3d at 208.

Second, the evidence must be "necessary" in the sense that, when viewed "in light of [other] evidence available to the government," it helps establish "an essential part of the crimes" or "part of the context of the crime." *Byers*, 649 F.3d at 206, 209 (citation omitted). Third, the evidence must be "reliable," meaning "it is not so preposterous that it could not be believed by a rational and properly instructed juror." *Siegel*, 536 F.3d at 319 (citation omitted).

Evidence that meets these requirements might still be excluded under Federal Rule of Evidence 403 if its "probative value [is] 'substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *Siegel*, 536 F.3d at 319 (quoting Fed. R. Evid. 403). But that is rare. Rule 403 bars evidence that presents a disproportionate "risk that the emotions of a jury will be excited to irrational behavior." *Id.* (citation omitted). Evidence otherwise admissible under Rule 404(b) "is not barred by Rule 403 where such evidence did not involve conduct any more sensational or disturbing than the crimes with which the defendant was charged." *Byers*, 649 F.3d at 210 (citation and alteration omitted).

### 2. *The Evidence Was Properly Admitted Under Rule 404(b)*

To convict Sterling on Count 3, the government had to prove that he unlawfully obtained a copy of Merlin's letter before his termination from the

CIA in January 2002 and "willfully retain[ed]" it in the Eastern District of Virginia. JA55; *see* 18 U.S.C. 793(e).[21] By pleading not-guilty, Sterling "put[] [his] intent at issue and thereby ma[de] relevant evidence of similar prior crimes" that could shed light on his state of mind. *Penniegraft*, 641 F.3d at 575 (citation omitted); *cf. Huddleston v. United States*, 485 U.S. 681, 685 (1988) (extrinsic acts are often "critical" to establishing defendant's state of mind because "the only means of ascertaining that mental state is by drawing inferences from conduct").

One way to establish intent is to show a pattern of similar conduct, thus "reducing the possibility that the act in question was done" innocently or accidentally. *United States v. Queen*, 132 F.3d 991, 996 (4th Cir. 1997) (citation omitted). The requisite pattern "may be demonstrated through physical similarity of the acts or through the defendant's indulging himself in the same state of mind in the perpetration of both the extrinsic offense and charged offenses." *Id.* (citation omitted). "[T]he more closely the prior act is related to the charged conduct—either in time, pattern, or state of mind—the more probative it is of the defendant's intent or knowledge in relation to the charged conduct." *United States v. Johnson*, 617 F.3d 286, 297 (4th Cir. 2010).

---

[21] The district court instructed the jury, without objection from Sterling, that a "willful" act is one performed "voluntarily and intentionally with the intent that something the law forbids be done." JA2311-12.

The extrinsic evidence here was closely linked to the charged conduct: Sterling acquired the documents and the letter from the same source and retained them at the same time; the documents and the letter were all uniquely accessible to him; and his retention of the documents and the letter was illegal for the same reasons—as Sterling well knew. That Sterling preserved his collection of classified documents for years, kept it in his home, and took it with him as he moved strongly indicated that his possession of classified materials was not unwitting or accidental. The evidence was also necessary: the jury lacked direct evidence of Sterling's state of mind and had to infer intent from the "development and collocation of circumstances." *Osborne*, 514 F.3d at 386 (citation omitted). The district court did not abuse its discretion in concluding that, once the jury found that Sterling possessed a copy of Merlin's letter, the extrinsic evidence was admissible as circumstantial proof that he did so willfully. *See, e.g.*, *Queen*, 132 F.3d at 998 (evidence "merely needs to be worth consideration by the jury" for a non-propensity purpose) (citation omitted).

Sterling's arguments to the contrary mischaracterize the district court's decision and the requirements of Rule 404(b) generally. For one thing, Sterling ignores the district court's instructions, which made clear that the jury could only consider the extrinsic evidence for the limited purpose of inferring

Sterling's state of mind—and only if it first found from "other evidence in the case standing alone that [Sterling] did the acts charged in the indictment." JA2299-2300. Sterling expends considerable effort trying to refute other possible uses of the evidence under Rule 404(b), such as establishing identity and opportunity, which the government initially urged but abandoned based on the court's instructions. *See* JA2200-01 (district court overrules government's objection to limiting Rule 404(b) instruction to state of mind).

Sterling also contends (Br. 50-52) that the extrinsic evidence did not show a pattern that could include the letter because the documents found in his home did not relate to Classified Program No. 1, and he did not disclose them. But extrinsic evidence need only "be *similar in nature* to the charged acts," either in terms of the physical acts themselves or the actor's state of mind. *Queen*, 132 F.3d at 996 (emphasis added). Both the documents and the letter were classified, yet Sterling deliberately retained them for years despite knowing it was illegal to do so. That the documents and the letter concerned different classified matters, or that he had not (yet) given the documents to anyone else when they were seized from his home, does not suggest that Sterling had different states of mind when possessing them.

In *Byers*, for example, the Court permitted evidence that the defendant committed a prior drug-related shooting to help prove the defendant's motive

and knowing possession of a firearm in connection with a drug-related murder committed two years later. 649 F.3d at 207-09. In *Queen*, the Court permitted evidence that the defendant previously threatened witnesses to prove his intent to threaten different witnesses in another case nine years later. 132 F.3d at 993, 998. And there are numerous cases where a defendant's possession of contraband on a prior occasion has been admitted to prove that his possession of similar contraband on a different occasion was intentional rather than accidental. *See, e.g.*, *Huddleston*, 485 U.S. at 682-83 (stolen merchandise); *Penniegraft*, 641 F.3d at 575 (drugs); *United States v. Whorley*, 550 F.3d 326, 338 (4th Cir. 2008) (child pornography); *United States v. Jernigan*, 341 F.3d 1273, 1281-82 (11th Cir. 2003) (firearms); *United States v. Crachy*, 800 F.2d 83, 87 (6th Cir. 1986) (counterfeit currency). The same principles support the admission of the evidence in this case.

The cases Sterling cites are inapposite. Two are drug cases in which the Court excluded evidence of prior drug dealing because the circumstances of the prior acts were entirely "unrelated in time, place, pattern, or manner" to the charged offenses. *United States v. McBride*, 676 F.3d 385, 397 (4th Cir. 2012); *Johnson*, 617 F.3d at 297-98. Other cases involved evidence used to establish opportunity or identity, not state of mind. *See United States v. Moore*, 709 F.3d 287, 295-96 (4th Cir. 2013) (evidence that defendant previously possessed

semiautomatic pistol did not show opportunity to use revolver during carjacking); *United States v. Foutz*, 540 F.2d 733, 737 (4th Cir. 1976) (evidence that defendant robbed bank inadmissible to establish identity in previous robbery where two crimes shared virtually nothing in common). The nexus between the extrinsic acts and the charged conduct in this case was much closer and was relevant to establishing Sterling's state of mind. At a minimum, it was not "arbitrary and irrational" for the district court to conclude that the evidence was admissible for reasons other than establishing Sterling's "bad character." *Byers*, 649 F.3d at 206 (citation omitted).

### 3. *The Evidence Was Properly Admitted Under Rule 403*

Sterling's claim (Br. 54-57) that the evidence unfairly prejudiced him and "crippled [his] defense" is meritless. As explained, evidence admissible under Rule 404(b) generally will not be excluded under Rule 403 unless it was "more sensational or disturbing than the crimes with which the defendant was charged." *Byers*, 649 F.3d at 210 (citation and alteration omitted). That is not the case here: Sterling's possession of the classified documents in his home was far less provocative than charges that he willfully disclosed classified information to a reporter with the intent that it be disseminated widely, resulting in the ruin of a successful counterproliferation program and endangering the lives of Merlin and his family.

Nor did the fact that three of the documents were shown to the jury with "Secret" coversheets cause Sterling any prejudice. Br. 56. Sterling objected to showing the jury unclassified versions of the documents, and the jury saw them only briefly, with limited questions about their provenance and no questions about their specific content. The notion that the jury would have been excited to irrational behavior based on seeing three classified documents for a few moments—in a lengthy trial involving a classified CIA operation and several witnesses who testified using pseudonyms and behind screens because their identities were secret—is not credible. *See Siegel*, 536 F.3d at 319.

Sterling also complains of "three references" made during the government's closing argument regarding his possession of classified documents in his home. Br. 48, 56. There was nothing wrong with these statements—they were part of a single argument, made within about 30 seconds of each other, relating to the legitimate non-propensity inferences discussed earlier—and Sterling did not object to them. JA2229-30. Regardless, the district court instructed the jury that statements made during closing arguments were not evidence and should be disregarded if inconsistent with the court's instructions. JA2285, 2287.

The court's instructions further eliminated any likelihood that the Rule 404(b) evidence would be misused. As explained, the court instructed the jury

at length about the proper use of the evidence, including limiting it to Sterling's state of mind and precluding the jury from inferring guilt from the classified nature of the documents. JA2292, 2299-2300. Juries are presumed to follow their instructions, *Weeks*, 528 U.S. at 234, and Sterling states no persuasive reason for disregarding that presumption here. *See Byers*, 649 F.3d at 210 (finding no prejudice where district court gave limiting instruction on use of Rule 404(b) evidence); *Queen*, 132 F.3d at 997 (same).

### D. Any Error Would Have Been Harmless

Regardless, even if Sterling's claims of error were true, they would not merit reversal. To establish that a non-constitutional error is harmless, the Court need only find that it did not have "a substantial and injurious effect or influence in determining the jury's verdict" on a particular count. *White*, 810 F.3d at 227 (citation omitted). As explained, the circumstantial evidence that Sterling willfully retained the letter and gave it to Risen was compelling. There is no likelihood that any prejudice from the other classified documents—a miniscule portion of the government's overall case—would have swayed the jury's verdict on those counts. Moreover, Sterling makes no effort to explain how evidence that he unlawfully possessed classified documents would have seriously affected his convictions for disclosure or attempted disclosure of information he possessed *lawfully*. JA52-54, 58, 61 (Counts 1, 4, 6, and 9).

Nor did the extrinsic evidence have any bearing on the jury's finding that Sterling obstructed justice by deleting his March 10, 2003 email, which was not a classified document and occurred long after the unlawful disclosures. JA62-63 (Count 10). And because the district court made clear that Sterling's concurrent sentences on each count would be the same regardless of whether any counts were vacated, JA2526-27, reversing the district court's evidentiary ruling would have no effect on his sentence.

## CONCLUSION

For the foregoing reasons, Sterling's convictions should be affirmed.

Respectfully submitted,

DANA J. BOENTE
United States Attorney

JAMES L. TRUMP
DENNIS M. FITZPATRICK
United States Attorney's Office
Eastern District of Virginia

ERIC G. OLSHAN
Criminal Division, Public
   Integrity Section
U.S. Department of Justice

LESLIE R. CALDWELL
Assistant Attorney General

SUNG-HEE SUH
Deputy Assistant Attorney General


s/  Robert A. Parker
ROBERT A. PARKER
Criminal Division, Appellate Section
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC  20530
(202) 514-3521

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, I hereby certify that that this brief contains 13,909 words (excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii)) and has been prepared in a proportionally spaced, 14-point typeface using Microsoft Word 2013.

s/ Robert A. Parker
Robert A. Parker

**CERTIFICATE OF SERVICE**

I hereby certify that on March 28, 2016, I filed the foregoing Brief for the United States with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to the following registered users:

Lawrence S. Robbins
William J. Trunk
Robbins, Russell, Englert, Orseck,
   Untereiner & Sauber LLP
1801 K Street, NW, Suite 411L
Washington, DC  20006

*Counsel for Jeffrey Alexander Sterling*

s/  Robert A. Parker
Robert A. Parker